UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

THOMAS A. EASON and MICHELLE
RADASZEWSKI,

      Plaintiffs,

v.                                                                Case No: 6:22-cv-801-JSS-RMN

UNITED STATES OF AMERICA,

      Defendant.

_____/

## **ORDER**

Plaintiffs, Thomas A. Eason and Michelle Radaszewski, sued Defendant, United States of America in this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680.  (*See* Dkt. 1.)  Mr. Eason and his wife, Mrs. Radaszewski, assert a count of negligence and a count of loss of consortium, respectively, arising from a January 19, 2021[1] collision between a bicycle ridden by Mr. Eason and a United States Postal Service (USPS) vehicle driven by USPS employee Ruth Ann Browning.  (*Id.*)  The court held a five-day bench trial from August 19 to 23, 2024.  (*See* Dkts. 101, 102, 103, 105, 106.)  Upon consideration of the evidence, the court sets forth its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 and directs the Clerk to enter judgment in

---

[1] Although Plaintiffs alleged in the complaint that the accident occurred on January 18, 2021, (Dkt. 1 at 1, 3), the parties stipulated in the joint pretrial statement that the accident occurred on January 19, 2021, (Dkt. 44 at 9).

favor of Plaintiffs under Federal Rule of Civil Procedure 58.[2]

## BACKGROUND

The parties identified five factual disputes to be decided at trial: (1) whether Ms. Browning was negligent, (2) whether Ms. Browning's negligence caused Mr. Eason's injuries, (3) whether Mr. Eason's injuries are permanent, (4) whether the treatment for which Mr. Eason seeks to recover medical expenses was reasonable, necessary, and related to the collision, and (5) the amount of Plaintiffs' damages. (*See* Dkt. 44 at 9.) The parties also stipulated that Plaintiffs timely filed their initial administrative claims with the USPS. (*Id.*) Because the FTCA states that a potential claimant must first "present[] the claim to the appropriate [f]ederal agency" and an FTCA action "shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency" (with certain exceptions not applicable here), 28 U.S.C. § 2675, Mr. Eason's damages cannot exceed $10,007,000 and Mrs. Radaszewski's cannot exceed $1,000,000—the amounts of Plaintiffs' initial claims to the USPS, (Dkt. 116 at 4, 7).

At trial, the court heard testimony from sixteen witnesses: Plaintiffs; Ms. Browning; USPS employee Obed Cintron; Mr. Eason's treating physicians, Brian K. Reiter, M.D., and David R. Campbell, M.D.; Mr. Eason's retained experts, Craig H. Lichtblau, M.D., and Frederick A. Raffa, Ph.D.; and Defendant's retained experts, Michael J. Herkov, Ph.D., William Postma, M.D., Srinivas Kadiyala, Ph.D., Ramon Gilberto Gonzalez, M.D. and Ph.D., Jeremy R. Cummings, Ph.D., David X. Cifu,

---

[2] To the extent that any findings of fact may constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law may constitute findings of fact, they are adopted as such.

M.D., Kevin M. McGrail, M.D., and Matthew B. Bishop, C.P.A. (*See* Dkts. 101, 102, 103, 105, 106.) In addition, the following exhibits were admitted into evidence: Plaintiffs' Exhibits 1 through 8, 10 through 18, 23, 27, 32, and 38 through 40. (Dkt. 99; *see* Dkts. 99-1 to 99-26.)

Following the trial, the parties submitted proposed findings of fact and conclusions of law, and Defendant filed a response in opposition to Plaintiffs' submission. (Dkts. 111, 112, 113.) Plaintiffs contend that Ms. Browning negligently operated the USPS vehicle at the time of the collision and caused them to suffer damages, including permanent injuries to Mr. Eason's left shoulder, brain, and cervical spine, past and future medical bills, Mrs. Radaszewski's loss of consortium with her husband, and other noneconomic injuries. (*See* Dkt. 111.) Plaintiffs further maintain that Mr. Eason was not negligent with regard to the collision. (*See id.*) In contrast, Defendant asserts that Plaintiffs did not establish that Ms. Browning was negligent or that the collision caused Mr. Eason permanent injuries or future medical damages or caused his wife a loss of consortium, and Defendant submits that Mr. Eason's comparative negligence in the operation of his bicycle caused him to be forty-nine percent at fault for the collision. (*See* Dkts. 112, 113.)

## FINDINGS OF FACT

The court makes the following findings of fact regarding Mr. Eason's condition before the accident, the accident, the immediate aftermath of the accident, the post-accident medical care that Mr. Eason received, the charges that he incurred for that care (that is, his past medical bills), and his marriage to Mrs. Radaszewski. In doing

so, the court generally credits the witnesses' statements at trial, as well as the medical records documenting Mr. Eason's post-accident care.

## A. Pre-Accident

Mr. Eason has been a cyclist for over fifty years. (Dkt. 101 at 99.) Before the accident, he regularly cycled approximately twenty miles on South Tropical Trail in Brevard County, Florida since 1981. (*Id.* at 106, 181.) He was also very active before the accident, cycled almost daily, and joined his wife in outdoor activities such as swimming, hiking, and kayaking. (Dkt. 102 at 119.) As to his medical history before the accident, he was a cancer survivor, had a knee replacement in 2015, and had a pin placed in his hip in 2018 after he fell while cycling. (Dkt. 101 at 182, 184.) He has Medicare and private health insurance. (*See id.* at 188–89.)

## B. The Accident

The accident occurred on South Tropical Trail, a two-lane road separated by a double yellow line, with one lane running north on the right and the other running south on the left. (Dkt. 44 at 9; Dkt. 99-26 at 8, 10; Dkt. 101 at 64.) The speed limit on the road is thirty miles per hour. (Dkt. 101 at 64.) The accident involved a Masi bicycle operated by Mr. Eason and a Long Life Vehicle (LLV), commonly known as a postal truck or mail delivery vehicle, driven by Ms. Browning. (*Id.* at 103.) At the time of the accident, Ms. Browning was an employee of the USPS, engaged in the course and scope of her employment, and operating the vehicle with the permission of the USPS, which owned the vehicle. (Dkt. 44 at 9.)

Ms. Browning had been delivering mail along this route for four or five years.

- 4 -

(Dkt. 101 at 63.)  She would often see bicyclists and pedestrians on the roadway. (*Id.* at 63–64.)  She had full visibility during the accident. (*See id.* at 75–76.)  The road conditions that day were sunny and dry.  (*Id.* at 89.)

On January 19, 2021, at 3:55 P.M., Ms. Browning was delivering mail along her postal route on South Tropical Trail.  (*Id.* at 67, 71.)  Ms. Browning executed a three-point turn at a private residence located at 10500 South Tropical Trail, delivered a package there, and faced forward in her vehicle to exit the residence's driveway.  (*Id.* at 64, 71, 87.)  Ms. Browning proceeded to exit the driveway to turn back onto the main roadway.  (*Id.* at 71–72, 76.)  At the end of the driveway, she stopped before entering the road.  (*Id.* at 74.)  After she stopped, she looked both ways and checked her side view mirror because she thought a woman at the residence was exiting the driveway behind her.  (*Id.* at 73, 77.)  After checking her side view mirror, Ms. Browning looked to her right again and turned right out of the driveway.  (*Id.* at 76–77.)

As Ms. Browning was about to turn, Mr. Eason was riding his bicycle eighteen to twenty-one miles per hour northbound on South Tropical Trail, approaching from the left side of Ms. Browning's vehicle.  (*Id.* at 105–07.)  He was wearing a helmet. (*See id.* at 79.)  He saw the USPS truck turning right out of the driveway approximately forty to forty-five feet away.  (*Id.* at 107–08.)  Although Mr. Eason saw Ms. Browning exiting the driveway and could have braked, he did not attempt to do so.  (*Id.* at 199–200.)  Instead, he tried to swerve his bicycle away from her vehicle toward the middle

of the road and to stiff-arm her vehicle. (*Id.* at 200–01.) Mr. Eason's attempt to avoid the USPS truck was unsuccessful, and Ms. Browning hit Mr. Eason with the USPS truck. (*See id.* at 113.) After being struck by the USPS truck, Mr. Eason was thrown from his bike and landed on the pavement. (*Id.*; *see* Dkt. 99-26 at 9.) Mr. Eason thought that Ms. Browning would stop turning onto the roadway before the accident. (*See* Dkt. 101 at 107–08.) Ms. Browning did not see Mr. Eason until after the impact. (*Id.* at 77–78, 80.) After the impact, Ms. Browning exited the truck. (*Id.*)

## C. The Immediate Aftermath of the Accident

After she exited her vehicle, Ms. Browning called her supervisor, Obed Cintron, her union representative, and 9-1-1. (*Id.* at 80.) Mr. Eason landed on his left eye orbit and shoulder. (*Id.* at 113.) Ms. Browning instructed him to lie still on the ground until the paramedics arrived. (*Id.* at 79–80.) When Mr. Eason hit the pavement, he injured his left eye and experienced severe pain in his leg and head. (*Id.* at 110, 113.) He also suffered arm and shoulder pain as he waited for the paramedics. (*Id.* at 116.) Mr. Eason did not lose consciousness after the USPS truck collided with him. (*Id.* at 91, 109.)

About half an hour after the accident, Mr. Cintron arrived to investigate the accident on behalf of the USPS. (*Id.* at 215.) At that time, Mr. Cintron was the USPS supervisor in Merritt Island, Florida. (*Id.* at 214.) Mr. Cintron spoke with Ms. Browning and the investigating police officers, inspected the USPS truck, took photographs, and looked at the driveway and the lines of sight. (*Id.* at 216, 220.) On

February 5, 2021, Mr. Cintron issued a letter of warning to Ms. Browning for the accident. (Dkt. 99-23.) He found her performance unsatisfactory for being "involved in a preventable vehicle accident on January 19, 2021," and noted that she had "struck a person riding a bicycle." (*Id.* at 1.) He further noted that although she was "not cited by the police, the officer responding to the scene of the accident stated [that] it was [her] responsibility to yield to pedestrians when making a turn." (*Id.*)

### D. Mr. Eason's Post-Accident Medical Care

Mr. Eason received post-accident care from over a dozen medical providers. (*See* Dkt. 99-22.) The court makes findings of fact concerning eleven of them: Brevard County Fire Rescue, Holmes Regional Medical Center, Injury Treatment Solutions, Ethos Health Group, Atlantic Orthopaedic Group, Orthopaedic Specialists of The Palm Beaches, Heldo Gomez, M.D., OSI Health Orthopedic & Spine Intervention, David Campbell, M.D., Brevard Accident & Work Injury Centers, and Elite Orthopedic & Spine Centers.

#### 1. Brevard County Fire Rescue

Paramedics from Brevard County Fire Rescue responded to the scene of the accident. (Dkt. 99-1 at 2.) Mr. Eason did not report a loss of consciousness to the paramedics, who likewise documented no neurological, cervical, or lumbar abnormalities. (*Id.* at 3.) The paramedics described Mr. Eason's mental status as good. (*Id.* at 2.) Mr. Eason reported pain in his left shoulder, and the paramedics observed and documented his eye injury. (*Id.* at 3.) Mr. Eason did not report any pain

in his neck to the paramedics.  (*Id.*)

### 2.  Holmes Regional Medical Center

The paramedics transported Mr. Eason via ambulance from the accident scene to the emergency room at Holmes Regional Medical Center.  (Dkt. 99-2 at 12.)  Upon arrival, Mr. Eason reported that he was in moderate pain.  (*Id.*)  His chief complaint was an injury to his left shoulder.  (*Id.*)  Mr. Eason ranked his shoulder pain as a two out of ten.  (*Id.* at 27.)  Mr. Eason also reported an injury to his head.  (*Id.* at 12.)

Jacqueline Llinas, M.D., conducted a physical examination of Mr. Eason.  (*Id.* at 13, 23.)  During the examination, Dr. Llinas noted his appearance as alert and oriented, with no acute distress and no motor or sensory deficits.  (*Id.*)  According to Dr. Llinas, Mr. Eason's neck appeared normal and supple, and his back was normal with no tenderness.  (*Id.*)  As to Mr. Eason's chief complaint, Dr. Llinas noted that his left shoulder was tender and had an abrasion.  (*Id.* at 12–13, 33.)  He scored fifteen out of fifteen on the Glasgow Coma Scale.  (*See id.* at 31.)

Dr. Llinas ordered X-rays of Mr. Eason's chest and left shoulder and CT scans of Mr. Eason's brain and cervical spine, both without contrast.  (*Id.* at 13.)  Radiologist, Irina Mezheritskiy, M.D., took the images, and Dr. Llinas independently reviewed them.  (*Id.* at 13–20.)  Mr. Eason's left shoulder X-ray showed no evidence of fracture, dislocation, or bony productive or destructive changes, and the visualized soft tissues were noted as unremarkable.  (*Id.* at 19.)  Mr. Eason's brain scan showed chronic microvascular ischemic disease changes without evidence of acute intracranial

hemorrhage, cerebral infarction, or hydrocephalus. (*Id.* at 14.) Mr. Eason's cervical spine scan showed degenerative changes but no evidence of cervical spine fracture. (*Id.* at 15.)

Given these findings, Mr. Eason was diagnosed with a superficial laceration above his left eyelid with multiple contusions and abrasions. (*Id.* at 21.) He received stitches for this laceration and morphine at the emergency room. (*Id.*) Mr. Eason was prescribed hydrocodone, and his left arm was placed in a sling. (*Id.*) He was then discharged and told to follow up with his primary care provider, Lydia Crane, M.D. (*Id.*)

### 3. Injury Treatment Solutions

Mr. Eason contacted Dr. Crane for treatment as instructed by the staff at Holmes Regional, and Dr. Crane referred him to Injury Treatment Solutions. (Dkt. 99-4 at 16.) The day after the accident, Mr. Eason went to that facility, where he presented with initial complaints of acute severe left shoulder pain rated nine out of ten, right leg pain rated seven out of ten, left eye/facial pain rated three out of ten, neck pain, back pain, and headaches. (*Id.* at 2, 16.) During this visit, an advanced practice registered nurse, Laura Burgess, conducted an initial examination of Mr. Eason. (*Id.* at 2.) Nurse Burgess asked Mr. Eason about his past medical history, which, included a right hip fracture, a right knee replacement surgery, and a pinched nerve in his lumbar area that pre-dated the accident. (*Id.* at 3–4.) Nurse Burgess found Mr. Eason to be alert and oriented, (*id.* at 6), and administered neurological tests,

which produced normal results for him, (*id.* at 8).  However, Nurse Burgess noted that
Mr. Eason experienced tenderness in all three parts of his spine: the cervical, thoracic,
and lumbar.  (*Id.* at 5–6.)  Nurse Burgess also conducted range of motion (ROM)
examinations.  (*Id.* at 7.)  The ROM examination of Mr. Eason's left shoulder
indicated that the shoulder had markedly decreased abduction, as Mr. Eason could
only abduct it 60 degrees with pain and 180 degrees is the normal ROM.  (*Id.*)  The
ROM examinations of Mr. Eason's cervical and lumbar spinal areas showed slight
decreases below the normal ROM.  (*Id.*) [3]

Mr. Eason's initial diagnosis encompassed three conditions: (1) post-traumatic
cervical, thoracic, and lumbar spine sprain/strain and facet syndrome associated with
ligamentous tearing secondary to post-traumatic wrenching of the facet joints beyond
their normal physiologic limit with associated muscular tearing in the spinal facet joint
inflammation and dysfunction with muscle spasm, (2) post-traumatic cervicogenic
headaches, and (3) left shoulder pain. (*Id.* at 9.)  To reach this diagnosis, Nurse Burgess
requested the records of the testing done at Holmes Regional.  (*Id.* at 3, 9.)  For the
treatment plan, Nurse Burgess referred Mr. Eason for a chiropractic evaluation,
conservative chiropractic treatment, and physical therapy.  (*Id.* at 10.)  She also

---

[3] For flexion of his cervical and lumbar spine, Mr. Eason was ten degrees below the normal ROM.
(Dkt. 99-4 at 7.)  For extension, he was ten degrees below the normal ROM for his cervical spine and
five degrees below the normal ROM for his lumbar spine. (*Id.*)  For both left and right lateral flexion
of his cervical and lumbar spine, he was five degrees below the normal ROM. (*Id.*)  For both left and
right rotation of his cervical spine, he was ten degrees below the normal ROM. (*Id.*)

ordered an MRI scan of his left shoulder and prescribed tramadol and ibuprofen.  (*Id.*
at 11, 16.)

On January 25, 2021, Mr. Eason presented to Viera Diagnostic Center for an
MRI by radiologist Carlene Gentles, M.D.  (Dkt. 99-7 at 6.)  The MRI showed a grade
three acromioclavicular joint separation with a rupture of the acromioclavicular
ligament.  (Dkt. 99-4 at 25.)  The MRI also showed a severe partial interstitial tear of
the trapezius muscle and partial tear of the deltoid ligament.  (*Id.*)  Mr. Eason also
presented to Injury Treatment Solutions complaining of new pain symptoms and
soreness throughout his neck and back on January 25, 2021.  (Dkt. 99-4 at 16.)
Chiropractor Stuart McCranels conducted an initial examination of Mr. Eason during
this visit.  (*Id.* at 26.)  A Vertebrobasilar Artery Screening Test (VAT) produced
negative results for Mr. Eason; however, Mr. Eason had positive test results for
localized cervical, thoracic, and lumbar pain, and additional ROM examinations
yielded similar results to the previous ROM examinations.  (*Id.* at 19–21.)  Although
Mr. Eason still had shoulder pain and was positive for shoulder impingement, his
shoulder abduction ROM had improved by thirty degrees.  (*Id.*)  Dr. McCranels also
ordered an X-ray of Mr. Eason's lumbar spine.  (*Id.* at 22.)  The X-ray revealed no
evidence of fracture or dislocation, but degenerative changes were noted throughout
the entire lumbar spine and were notably worse at L4-5 and L5-S1.  (*Id.*)

For the injury to the left shoulder, Dr. McCranels diagnosed Mr. Eason with
the grade three acromioclavicular joint separation and trapezius-muscle and deltoid-
ligament tears seen on the MRI.  (*Id.* at 23.)  Dr. McCranels concurred with Nurse

Burgess's initial diagnoses, (*id.*), and recommended a conservative chiropractic and physical therapy treatment plan for Mr. Eason that included four treatments: (1) spinal manipulation to the cervical, thoracic, and lumbar spine, (2) heat and electric muscle stimulation to reduce inflammation and swelling to the cervical and thoracic spine, (3) infrared light therapy to promote cellular regeneration and improve circulation to his left shoulder areas, and (4) intersegmental traction to strengthen and mobilize his thoracic and lumbar spine. (*Id.* at 24.) From January 27, 2021, to April 19, 2021, Mr. Eason presented to Injury Treatment Solutions to receive the conservative care described above. (Dkt. 99-5 at 221.) During his visit on February 26, 2021, Mr. Eason reported experiencing dizziness and pain along the left side of his neck. (Dkt. 99-4 at 120.) Mr. Eason wanted to be referred to a neurologist who would see him in person because he was having virtual appointments with a nurse at Ethos Health Group. (*Id.*) Dr. McCranels ordered brain and cervical MRIs. (*Id.*) On March 4, 2021, Mr. Eason presented to Viera Diagnostic Center to have the MRIs completed by Dr. Gentles. (Dkt. 99-7 at 4–5.) His brain MRI showed normal-sized ventricles and sulci for his age and no intracranial hemorrhage, extra-axial fluid collection, midline shift, or abnormal mass. (*Id.* at 5.) Dr. Gentles's impression from the brain MRI echoed the findings from the brain CT scan at Holmes Regional: mild chronic small vessel ischemic changes. (*Id.*) Dr. Gentles also noted mild increased T2 signal intensity in the left mastoid air cells. (*Id.*) Mr. Eason's cervical spine MRI showed a disc bulge at C4-C5 and disc herniation at C5-C6, each with severe bilateral foraminal stenosis. (*Id.* at 4.) Given these results, Dr. McCranels further diagnosed Mr. Eason with post-

traumatic disc herniation and bulge and stated that the diagnosis was "complicated by pre[]existing previously asymptomatic degenerative changes." (Dkt. 99-4 at 165.)

During his visit on April 9, 2021, Mr. Eason reported continued improvement with his treatment, but he still felt some stiffness along the left side of his neck and around his left shoulder area. (Dkt. 99-5 at 214.) Mr. Eason's last ROM examination, on April 19, 2021, showed significant improvement in his left shoulder. (*Id.* at 212.) His abduction ROM, initially 60 degrees, improved to 110 degrees, albeit with pain. (*Id.*) Mr. Eason also improved his cervical and lumbar ROMs, which deviated at most four degrees from normal in a category. (*Id.*)

### 4. Ethos Health Group

Almost a month after the accident, on February 15, 2021, Mr. Eason presented to Ethos Health Group with chief complaints of dizziness, balance problems, cognitive dysfunction, memory problems, and fatigue. (Dkt. 99-8 at 19.) An advanced practice registered nurse, Jennifer Waicus, conducted an initial neurologic examination of Mr. Eason. (*Id.*) Nurse Waicus noted that Mr. Eason could recall the month, date, and year. (*Id.* at 20.) Moreover, tests involving fields of gaze, pupil reactivity, the cranial nerve, the tongue, tremors, deep tendon reflexes, finger-to-nose coordination, pronator drift, color contradiction, and the ability for the eye to follow or look away from a finger flick produced normal results for Mr. Eason. (*Id.*) However, three tests yielded abnormal results: the Romberg test (feet together, eyes closed), the modified Bess test (tandem walk, foot of dominant arm first), and the three-object recall test. (*Id.*)

Regarding the latter, Mr. Eason could recall only one of the three objects. (*Id.*) Although many tests produced normal results for Mr. Eason, Nurse Waicus diagnosed him with a traumatic brain injury, dizziness, vertigo, decreased cognitive function, and bilateral tinnitus. (*Id.*) Nurse Waicus thus referred Mr. Eason for a range of neurological tests and a brain MRI. (*Id.*) She recommended that Mr. Eason begin traumatic brain injury therapy to include alpha stimulation, vagus nerve stimulation, exercise with oxygen, infrared therapy, cognitive therapy, and oculomotor therapy after testing. (*Id.*)

Mr. Eason presented to Ethos to receive the recommended treatment described above until he was discharged from care on July 19, 2021.[4] (*Id.* at 72–75.) On that day, Nurse Waicus conducted a physical examination of Mr. Eason, and he denied experiencing neck pain or dizziness. (*Id.* at 73.) Nurse Waicus also conducted a neurological evaluation, and every test returned normal results. (*Id.* at 74.)

During multiple visits with Dr. McCranels, Mr. Eason complained about the treatment he received at Ethos. For example, during the February 26, 2021 visit, Mr. Eason complained that his virtual appointment with the neurologist at Ethos was "unfulfilling" because "the neurologist seemed to be more concerned with getting all of the information surrounding the motor vehicle crash with very little emphasis on [Mr. Eason's] symptoms." (Dkt. 99-4 at 120.) During a March 5, 2021 visit, Mr.

---

[4] Mr. Eason returned to Ethos on September 14, 2021. (Dkt. 99-8 at 132–136.) On that day, he met with physical therapist Sheena Stone, who recommended that he see her two times a week for twelve weeks for various therapies. (*Id.* at 134–35.) Mr. Eason did not return to Ethos after this appointment. (*See id. passim.*)

Eason complained that he had not yet met in person with the neurologist at Ethos.
(*Id.* at 151.)  During a March 22, 2021 visit, over a month into his treatment at Ethos,
Mr. Eason complained that he had "been evaluated by a medical doctor, non-
neurologist at a facility that claims to deal with head injuries and concussions." (*Id.*
at 221 (emphasis omitted).)  Despite the "handful of tests" administered at Ethos, Mr.
Eason reportedly did "not feel that there ha[d] been any significant
treatment . . . offered." (*Id.* (emphasis omitted).)  Dr. McCranels advised Mr. Eason
"to search out a neurologist on his own to find a more reputable neurologist that would
be willing to treat a patient who was involved in a motor vehicle crash." (*Id.* (emphasis
omitted).)

### 5. Atlantic Orthopaedic Group

On March 3, 2021, Mr. Eason presented to Atlantic Orthopaedic Group to
consult with orthopedist John D. Hermansdorfer, M.D. (Dkt. 99-9 at 5.)  During the
consultation, Mr. Eason described experiencing constant left shoulder pain—aching,
dull, and sharp—and a limited ROM. (*Id.*)  Mr. Eason also reported that his left
shoulder pain was a three out of ten that day. (*Id.*)  Upon examination, Dr.
Hermansdorfer noted that the ROM for Mr. Eason's left shoulder was "grossly limited
and with pain." (*Id.*)  Dr. Hermansdorfer ordered an MRI and an X-ray of the
shoulder. (*Id.* at 6.)  After reviewing these scans, Dr. Hermansdorfer determined:
"There is separation, acromioclavicular joint, type III.  There is no fracture.  Visual
inspection of the shoulder joint reveals no glenohumeral joint space narrowing.  Soft

tissue exam shows normal soft tissue." (*Id.*)  Based on these determinations, Dr. Hermansdorfer devised a tentative treatment plan of continued conservative therapy, and he anticipated reevaluating the plan in a month. (*Id.*)

Mr. Eason returned to Dr. Hermansdorfer once more, for a follow-up on April 21, 2021. (*Id.* at 3.)  During this appointment, Mr. Eason stated that he felt no left shoulder pain that day and that his pain was intermittent and aching. (*Id.*)  Dr. Hermansdorfer stated that Mr. Eason "was making good progress with his left shoulder recovery with conservative treatment and physical therapy." (*Id.*)  Dr. Hermansdorfer advised Mr. Eason to continue his home exercise program and to follow up as necessary. (*Id.*)

### 6. Orthopaedic Specialists of The Palm Beaches

On July 12, 2021, Mr. Eason consulted with surgeon Brian Reiter, M.D., at the Orthopaedic Specialists of the Palm Beaches. (Dkt. 99-11 at 23.)  Dr. Reiter confirmed Dr. Hermansdorfer's earlier diagnosis of a partial rotator cuff tear in Mr. Eason's left shoulder and a dislocation of the left acromioclavicular joint. (*Id.*)  Dr. Reiter advised Mr. Eason to undergo shoulder and clavicle surgeries if Mr. Eason felt that he could not "return to his activities of daily living at a level that he is happy with." (*Id.* at 24.) Mr. Eason did not elect to have those surgeries that day and stated that he would consider the surgeries as options. (*Id.*)  In addition, Dr. Reiter recommended that Mr. Eason see a spine surgeon for his herniated disc. (*Id.*)  Mr. Eason did not visit Dr. Reiter again until January 24, 2022. (*Id.* at 22.)  On that day, Mr. Eason informed Dr. Reiter that he still had pain and weakness in his left shoulder and that he could not do

exercises such as pull-ups and push-ups due to the pain in his left arm. (*Id.*) Mr. Eason did not elect to have surgery at that time. (*See id.*) Dr. Reiter ordered a new MRI of Mr. Eason's left shoulder. (Dkt. 99-10 at 2.) On February 19, 2022, Mr. Eason underwent an MRI with radiologist David Williams, M.D. at NeuroSkeletal Imaging. (*Id.* at 2–3.)

Mr. Eason saw Dr. Reiter again on March 4, 2022, via a telemedicine appointment. (Dkt. 99-11 at 20.) During this visit, Dr. Reiter reviewed the results of the MRI of Mr. Eason's left shoulder. (*Id.*) According to Dr. Reiter, the MRI showed a full, not partial, rotator cuff tear. (*Id.*; Dkt. 99-17 at 2–4.) Dr. Reiter opined that although Mr. Eason's original MRI supported the partial-tear diagnosis, Mr. Eason could have had a full tear from the beginning, as the images generated by the original MRI were not as clear as those generated by the most recent MRI. (Dkt. 99-11 at 21.) Dr. Reiter discussed the MRI results with Mr. Eason and concentrated more on treating the rotator cuff tear through conservative and surgical options instead of treating the acromioclavicular separation. (*See id.*) Mr. Eason chose not to have surgery to repair his rotator cuff tear at that time, and Dr. Reiter set up an appointment to discuss Mr. Eason's treatment options again in a couple of weeks. (*Id.*) On April 4, 2022, Mr. Eason had another telemedicine appointment with Dr. Reiter, during which Mr. Eason reported that his shoulder pain was worsening. (*Id.* at 18.) After Dr. Reiter informed Mr. Eason that it would be "too much surgery" to fix the tear and reconstruct the acromioclavicular area, Mr. Eason decided to have surgery to repair the rotator cuff tear. (*Id.* at 18–19.) Accordingly, Dr. Reiter initiated the pre-operation

testing and clearance process for Mr. Eason's rotator cuff surgery. (*Id.* at 19.)

Two days before his surgery, on July 27, 2022, Mr. Eason had another telemedicine appointment with Dr. Reiter. (*Id.* at 16.) Dr. Reiter directed him to continue conservative treatment for his acromioclavicular separation, answered his questions about the upcoming surgery, and advised him of his postoperative course of treatment. (*Id.*) On July 29, 2022, Mr. Eason presented to a surgery center, SurgCenter of Palm Beach Gardens for his rotator cuff surgery. (Dkt. 99-19 at 29.) Mr. Eason was placed under general anesthesia while Dr. Reiter made some incisions in his left shoulder and performed the surgery arthroscopically. (*Id.* at 29–30.) After completing the repair, Dr. Reiter irrigated Mr. Eason's left shoulder, stitched the incision, and applied sterile dressing and an arm sling. (*Id.*) Dr. Reiter discharged Mr. Eason home that same day with pain medications and instructed him to follow up in one week. (*Id.*)

Mr. Eason followed up with Dr. Reiter on August 4, 2022, and Dr. Reiter noted that Mr. Eason was doing well after the surgery. (Dkt. 99-11 at 14.) Dr. Reiter examined the left shoulder, observed that the surgical incisions had healed, and removed the sutures. (*Id.* at 14–15.) Dr. Reiter prescribed physical therapy and demonstrated exercises he wanted Mr. Eason to do at home to aid his recovery. (*Id.* at 15.) Nearly two weeks later, on August 17, Mr. Eason had another telemedicine appointment with Dr. Reiter. (*Id.* at 12–13.) Mr. Eason stated that his physical therapy was going well and that he was completing the exercises Dr. Reiter told him to do at home. (*Id.* at 12–13.) Mr. Eason reported swelling in his left elbow, which

was not causing him pain, and Dr. Reiter diagnosed the cause of the swelling as olecranon bursitis, likely from Mr. Eason's keeping his arm in a sling following the surgery.  (*Id.* at 13.)  Dr. Reiter informed Mr. Eason that during a follow-up appointment in a few weeks, Dr. Reiter could aspirate the elbow and inject some cortisone as needed.  (*Id.*)  In the meantime, Dr. Reiter recommended that Mr. Eason use ice and anti-inflammatories and pad his elbow inside the sling.  (*Id.*)

About three weeks later, on September 8, 2022, Mr. Eason saw Dr. Reiter again. (*Id.* at 10.)  Because the bursitis had not improved, Dr. Reiter aspirated the elbow and instructed Mr. Eason to use a compression bandage and ice the area for a couple of days.  (*Id.* at 10–11.)  Mr. Eason saw Dr. Reiter again on October 21, 2022.  (*Id.* at 8.) Dr. Reiter evaluated the strength of the rotator cuff as a four out of five and noted that the bursitis had significantly improved with only a slight recurrence.  (*Id.* at 9.)  Dr. Reiter advised Mr. Eason to keep icing the area, gave him a new prescription and protocol for physical therapy, and told him to follow up for reevaluation in two months.  (*Id.*)  Mr. Eason followed up again on December 15, 2022.  (*Id.* at 6.)  Mr. Eason still felt some pain on the side of his shoulder when he started to exercise, and the pain improved after he completed several repetitions.  (*Id.*)  Despite Mr. Eason's pain, Dr. Reiter noted that the left shoulder showed full ROM and good strength during this visit.  (*Id.*)  Dr. Reiter advised Mr. Eason to continue his home exercises and predicted that the discomfort in the shoulder would improve.  (*Id.* at 7.)

Because Mr. Eason still felt a sharp pain in his shoulder when he performed

certain exercises, he saw Dr. Reiter again on February 2, 2023.  (*Id.* at 4.)  Dr. Reiter

suggested that Mr. Eason undergo another MRI "to assess the integrity of the rotator

cuff repair."  (*Id.* at 5.)  Mr. Eason also complained of neck and lower back pain, for

which Dr. Reiter suggested he see a spine specialist.  (*Id.* at 4–5.)  On March 3, 2023,

radiologist Robert Martinez, M.D. performed another MRI of Mr. Eason's left

shoulder at Coastline Imaging.  (Dkt. 99-17 at 13.)  On March 14, 2023, Mr. Eason

had a telemedicine appointment with Dr. Reiter to discuss the results of the MRI.

(Dkt. 99-11 at 2.)  This appointment was Mr. Eason's last with Dr. Reiter.  (*See id.

passim*.)  During the appointment, Dr. Reiter informed Mr. Eason that the MRI

showed his rotator cuff had torn again.  (*Id.* at 2–3.)  Dr. Reiter recommended that Mr.

Eason undergo reverse shoulder replacement surgery because the "rotator cuff did not

heal successfully with [the] primary repair."  (*Id.* at 3.)  He also recommended

acromioclavicular reconstruction surgery.  (*Id.*)  Instead, Mr. Eason planned to

continue his home exercise program and contact Dr. Reiter if he decided to undergo

surgery.  (*Id.*)  As of the end of the trial, Mr. Eason had not had these surgeries.  (*See*

Dkt. 101 at 164–65.)

### 7.  Heldo Gomez, M.D.

Based on Dr. Reiter's recommendation, on July 20, 2021, Mr. Eason sought

treatment for his cervical spine from neurosurgeon Heldo Gomez, M.D.  (Dkt. 99-12

at 28.)  Mr. Eason informed Dr. Gomez that he had posterior neck pain and left

shoulder pain.  (*Id.*)  Dr. Gomez recommended that Mr. Eason have cervical spinal

surgery to decompress his exiting C6 nerve root.  (*Id.* at 29.)  Mr. Eason did not agree to have the surgery and returned to see Dr. Gomez on August 17, 2021, complaining of symptoms in his cervical region, particularly in his left shoulder and clavicle areas. (*Id.* at 27.)  Dr. Gomez again recommended cervical spinal surgery to Mr. Eason.  (*Id.*) Mr. Eason again declined surgery and returned to Dr. Gomez on February 1, 2022, to discuss his hesitancy to undergo surgery.  (*Id.* at 26.)  Dr. Gomez tentatively diagnosed Mr. Eason with cervical facet syndrome.  (*Id.*)  Dr. Gomez recommended confirming this diagnosis through bilateral C4, C5, and C6 branch block injections under fluoroscopic guidance and conscious sedation.  (*Id.*)  Mr. Eason declined the injections.  (*See id.* at 143.)  Mr. Eason did not return to Dr. Gomez until October 25, 2022.[5]  (*See id.* at 30, 143.)  Mr. Eason's last visit with Dr. Gomez was almost a year later, on September 13, 2023.  (*Id.* at 143.)  During this visit, Dr. Gomez reiterated his previous injection recommendation.  (*Id.* at 143–44.)

### 8.  OSI Health Orthopedic & Spine Intervention

On February 21, 2023, Mr. Eason presented to OSI Health Orthopedic & Spine Intervention to treat the pain in his neck and left shoulder.  (Dkt. 99-14 at 2.)  A certified advanced practice registered nurse, Dawn Hamel, examined Mr. Eason.  (*Id.*) Nurse Hamel primarily diagnosed Mr. Eason with left shoulder pain and a recurrent rotator cuff tear, as confirmed by Dr. Reiter on March 14, 2023.  (*Id.* at 3.)  As to his cervical spine, Nurse Hamel diagnosed Mr. Eason with a sprain and with the cervical

---

[5] The medical record for this visit is missing from the exhibit.  (*See* Dkt. 99-12.)

facet joint syndrome that Dr. Gomez had previously mentioned. (*Id.*; Dkt. 99-12 at

26.)  After reaching these diagnoses, Nurse Hamel did not provide Mr. Eason with a

treatment plan; instead, she referred him for new cervical spine and left shoulder MRIs

and told him to follow up in three weeks to review the MRI results and discuss

treatment. (Dkt. 99-14 at 4–5.)  Mr. Eason got the MRIs at Coastline Imaging on

March 3, 2023. (Dkt. 99-18 at 1–3.)

Mr. Eason last visited OSI Health on April 5, 2023, when Nurse Hamel

reviewed the MRI results. (Dkt. 99-14 at 28–32.)  According to Nurse Hamel, Mr.

Eason's left shoulder MRI showed a recurrent rotator cuff tear. (*Id.* at 30.)  Nurse

Hamel discussed providing Mr. Eason with a referral for an orthopedic consult, but

Mr. Eason declined because he did not wish to undergo another surgery. (*Id.* at 31.)

For the cervical spine, Nurse Hamel explained, the MRI showed cervical disc

herniation and mild to moderate foraminal stenosis, primarily in the C4–C7 region.

(*Id.* at 30.)  Nurse Hamel recommended that Mr. Eason undergo branch block

injections, as Dr. Gomez would later recommend, and that Mr. Eason continue

conservative care with a chiropractor. (*Id.* at 31.)  Mr. Eason declined the injections.

(*Id.*)

### 9.  David Campbell, M.D.

Over two and a half years after the accident, on October 18, 2023, Mr. Eason

presented to spinal surgeon David Campbell, M.D., with complaints of lower back

pain and neck pain. (Dkt. 99-15 at 8.)  Dr. Campbell conducted a physical

examination and noted that Mr. Eason's neck had posterior cervical and paraspinal

- 22 -

tenderness. (*Id*. at 9.) Dr. Campbell further noted that Mr. Eason's neck pain was on the left side of his neck by his shoulder. (*Id*. at 8–9.) Dr. Campbell reviewed the March 3, 2023, MRIs taken of Mr. Eason's left shoulder and cervical spine and the February 19, 2022, MRI of the left shoulder. (*Id*. at 9–10.) Dr. Campbell diagnosed Mr. Eason with degenerative cervical disc disease, cervical disc disorder, pain in the left shoulder, lumbar radiculopathy, and other injuries. (*Id*. at 10–11.) Dr. Campbell agreed with Dr. Gomez that Mr. Eason should get cervical branch block injections, and he further recommended that Mr. Eason continue rehabilitation, physical therapy, and medication management. (*Id*. at 11.) Dr. Campbell also agreed with Dr. Gomez's initial recommendation of cervical spine surgery. (*Id*.) Dr. Campbell reasoned that Mr. Eason should have the surgery "due to the chronic nature of [his] cervical rigidity, pain, [and] activity limitations." (*Id*.) However, Mr. Eason preferred less invasive treatment options. (*Id*.) Dr. Campbell ordered new MRIs of Mr. Eason's cervical and lumbar spine and an X-ray of his cervical spine to be reviewed at a follow-up appointment. (*Id*. at 10; Dkt. 99-17 at 28.) On November 20, 2023, Mr. Eason had these scans taken at Coastline Imaging by radiologist Avery Knapp, M.D. (Dkt. 99-17 at 28, 33–46.)

Mr. Eason had a telemedicine appointment with Dr. Campbell on November 30, 2023, to follow up on the results of the scans. (Dkt. 99-15 at 3–5.) According to Dr. Campbell, the MRIs showed straightening of the normal cervical lordosis, which an acute cervical injury could cause, but clinical correlation was recommended to confirm this diagnosis. (*Id*.) Dr. Campbell noted that the X-ray showed "extensive

degenerative changes of the cervical spine . . . between C4 and C7." (*Id.* at 5.) Comparing the MRI taken of Mr. Eason's cervical spine on November 20, 2023, with the one taken on March 3, 2023, Dr. Campbell identified a new disc herniation at C2-C3. (*Id.* at 5.) Dr. Campbell diagnosed Mr. Eason with bi-foraminal disc herniations in the L1-L2, L2-L3, L4-L5, and L5-S1 regions, right moderate spinal stenosis in the L1-L2, L2-L3, and L3-L4 regions, right paracentral neural foraminal disc herniation in the L3-L4 region, central disc herniation in the L5-S1 region, severe spinal stenosis in the L4-L5 region, moderate spinal stenosis in the L1-L2, L2-L3, and L5-S1 regions, and mild spinal stenosis in the L3-L4 region. (*Id.* at 3–4.) Dr. Campbell advised Mr. Eason to maintain the conservative treatment and informed Mr. Eason of his availability if Mr. Eason wanted to have cervical spine surgery. (*Id.* at 6.) Dr. Campbell encouraged Mr. Eason to continue stretching and strengthening exercises. (*Id.*)

In addition, Dr. Campbell referred Mr. Eason to undergo a thoracic MRI "to evaluate [the] thoracic spine pain that ha[d] not been evaluated yet." (*Id.*) Accordingly, nearly three years after the accident, on December 11, 2023, Mr. Eason obtained an MRI of his thoracic spine from radiologist Matthew Hermann, M.D. at Coastline Imaging. (Dkt. 99-17 at 54–59.) On January 17, 2024, Mr. Eason had a telemedicine appointment with Dr. Campbell to follow up on the MRI results. (Dkt. 99-16 at 19.)

### 10. Brevard Accident & Work Injury Centers

Three years after the accident, on March 28, 2024, Mr. Eason began physical

therapy at Brevard Accident & Work Injury Centers.  (Dkt. 99-21 at 1.)  Chiropractor
David Dorman performed the initial evaluation.  (*Id.* at 1–5.)  Dr. Dorman felt
tenderness in all parts of Mr. Eason's spine and left shoulder. (*Id.* at 2–3.) Dr. Dorman
noted that Mr. Eason's ROM for all these areas was reduced.  (*Id.* at 3.)  Dr. Dorman
recommended that Mr. Eason undergo physical therapy at his office two to three times
a week for four weeks, and he provided a conservative chiropractic and physical
therapy treatment plan for Mr. Eason that included "chiropractic manipulative
therapy, soft tissue technique, manual traction, electric muscle stimulation,
ultrasound, kinetic therapy, therapeutic exercises, heat, and cryotherapy." (*Id.* at 5.)
Dr. Dorman noted that Mr. Eason was traveling to Italy on April 25 and returning at
the end of July.  (*Id.*)

Mr. Eason returned to Brevard Accident for eight physical therapy
appointments in April 2024.  (*Id.* at 6–17.)  Dr. Dorman applied hot packs and
electrical stimulation to Mr. Eason's neck, lower back, and left shoulder and provided
Mr. Eason with manual and trigger point therapies for his muscles.  (*Id.*)

### 11. Elite Orthopedic & Spine Centers

Mr. Eason presented to Elite Orthopedic & Spine Centers on April 3, 2024, to
receive steroid injections in his spine from pain medicine specialist Antonio Poto,
M.D.  (Dkt. 99-13 at 4–6.)  On April 19, 2024, Mr. Eason returned to Dr. Poto for a
follow-up appointment.  (*Id.* at 1–2.)  During this visit, Mr. Eason's last to Elite
Orthopedic, Dr. Poto recommended that Mr. Eason continue conservative care by

taking anti-inflammatories as needed for pain and maintaining a home exercise program.  (*Id.* at 2.)

### E. Mr. Eason's Past Medical Bills

Mr. Eason's past medical bills are as follows:

1. Brevard County Fire Rescue: $817.40, (Dkt. 99-22 at 4);

2. Holmes Regional Medical Center: $8,182.99, (*id.* at 17);

3. Injury Treatment Solutions: $13,200, (*id.* at 45);

4. Ethos Health Group: $27,780.60, (*see id.* at 23–36);

5. Atlantic Orthopaedic Group: $0 outstanding because Mr. Eason's health insurance paid the balance, (*id.* at 37);

6. Dr. Reiter: $26,386.20, (*id.* at 12–14);

7. SurgCenter of Palm Beach Gardens: $89,397, (*id.* at 20);

8. Dr. Gomez: $1,950, (*id.* at 11);

9. OSI Health: $1,249, (*id.* at 19);

10. Dr. Campbell: $1,976, (*id.* at 10);

11. Brevard Accident & Work Injury Centers: $1,905, (*id.* at 2–3);

12. Elite Orthopedic & Spine Centers: $7,092, (*id.* at 16);

13. Viera Diagnostic Center: $2,705.83, (*id.* at 22);

14. NeuroSkeletal Imaging: $195.74, (*id.* at 31);

15. Coastline Imaging: $6,754, (*id.* at 8);

16. Ocala Anesthesia: $10,345, (*id.* at 18);

17. Infinity DME: $3,250, (*id.* at 1);

18. Brevard Physician Associates: $1,079, (*id.* at 5–6);

19. Gary Weiss, M.D.: $4,525, (*id.* at 9); and

20. John Stadelman: $525, owed and paid by Mr. Eason, (*id.* at 15).

Mr. Eason contends that after subtracting his personal injury protection payments and insurance copayments, his outstanding past medical bills total $197,616.90. (Dkt. 111 at 17.) Defendant asserts that Mr. Eason's past medical bills minus insurance payments total $203,040.20. (Dkt. 112 at 22; Dkt. 112-1 at 5.) However, Defendant challenges the reasonableness and necessity of some of the bills submitted and further asserts that some of the bills Mr. Eason submitted into evidence do not contain a corresponding medical record and, therefore, should be excluded from the damages calculation. (Dkt. 112 at 20–23.) The court addresses this issue in the damages section below.

### F. Mr. Eason's Marriage to Mrs. Radaszewski

Mrs. Radaszewski has been married to Mr. Eason since 2008. (Dkt. 102 at 117–18.) Before the accident, Mrs. Radaszewski and Mr. Eason got along well and shared responsibilities. (*Id.* at 121.) After Mr. Eason called Mrs. Radaszewski on the day of the accident to tell her that he had been hit by a mail truck on South Tropical Trail, Mrs. Radaszewski left her job and went to the emergency room at Holmes Regional to be with him. (*Id.* at 122–23.) After she arrived, she observed that Mr. Eason was a little dazed, had lacerations on his head, his eye was swollen shut and bloodied, his shoulder looked disfigured, he had cuts on his lower body, and he was in pain. (*Id.* at

123–24.)    After Mr. Eason was discharged from the emergency room, Mrs. Radaszewski took pictures of his injuries.  (*Id.* at 126–27.)  The pictures depict Mr. Eason with a raised clavicle on the left side and bruising around his left eye, shoulder, and right hip.  (Dkt. 99-24 at 1, 3, 6, 9, 13.)  According to Mrs. Radaszewski, Mr. Eason's left shoulder still bothers him, and "in the beginning[,] his neck [did not] really hurt him.  It was his shoulder.  Now [his shoulder pain] kind of migrated . . . down his cervical spine a little bit."  (Dkt. 102 at 141.)

Mrs. Radaszewski noticed a change in Mr. Eason's short-term memory about six months after the accident.  (*Id.* at 134–36.)  Specifically, she described instances in which Mr. Eason purchased the wrong paint color for the house after discussing the chosen color, forgot the location of a hotel reservation, and forgot to purchase an item from the store.  (*Id.* at 135–36.)  Mr. Eason's forgetfulness frustrated Mrs. Radaszewski and caused stress in the marriage.  (*Id.* at 137.)  Mr. Eason also gets frustrated more easily, which is difficult and causes more conflict.  (*Id.*)

Although Mrs. Radaszewski and Mr. Eason formerly shared household chores, his shoulder injury prevented him from doing so until he had shoulder surgery.  (*Id.* at 139, 153.)  With regard to the activities that they used to enjoy together, Mrs. Radaszewski and Mr. Eason cannot kayak or bicycle together as they used to do, but they can still go on walks and use the pool.  (*Id.* at 142–43.)  Further, when shown photos posted to her Instagram account, (*see* Dkt. 99-25), Mrs. Radaszewski confirmed that despite Mr. Eason's injuries, after the accident, she traveled with him five times: (1) about three hours away from their house to St. Petersburg, Florida, for lunch on

April 3, 2021; (2) to a theater in Melbourne, Florida, on April 16, 2021; (3) to Europe
in September 2021; (4) to Miami, Florida, in October 2022; and (5) to a farm located
in Glenview, Illinois, in November 2022.  (Dkt. 102 at 157–63, 170–72.)

## CONCLUSIONS OF LAW

The court first presents an overview of the applicable law, next examines the
elements of Mr. Eason's negligence claim (duty and breach, causation, and damages),
then discusses Defendant's comparative negligence defense, and last addresses Mrs.
Radaszewski's loss of consortium claim.

### A. Overview

The court has jurisdiction over this case pursuant to the FTCA.  *See* 28 U.S.C.
§ 1346(b)(1).  The FTCA includes a limited waiver of sovereign immunity of the
United States with respect to claims for money damages, injury or loss of property,
personal injury, or death caused by the negligent or wrongful act or omission of a
government employee acting in the scope of his or her employment.  *See id.*; *Dalrymple
v. United States*, 460 F.3d 1318, 1324 (11th Cir. 2006) ("The FTCA provides a limited
waiver of the United States'[s] sovereign immunity for tort claims.").  Suits brought
under the FTCA are governed by the "law of the place where the act or omission
occurred."  28 U.S.C. § 1346(b)(1); *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 478
(1994) ("[Section] 1346(b)'s reference to the 'law of the place' means law of the
[s]tate—the source of substantive liability under the FTCA.").  The parties stipulated
that the accident occurred in Brevard County, Florida.  (Dkt. 44 at 9.)  Therefore,

Florida substantive law applies.  *See* 28 U.S.C. § 1346(b)(1); *Meyer*, 510 U.S. at 478.

To establish negligence under Florida law, a plaintiff must prove four elements: (1) a duty of care owed by the defendant to the plaintiff, (2) the defendant's breach of that duty, (3) causation, and (4) damages suffered by the plaintiff.  *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) ("A negligence claim requires a plaintiff to show that (1) defendants owe plaintiffs a duty, (2) defendants breached the duty, (3) defendants' breach injured plaintiffs, and (4) plaintiffs' damage was caused by the injury to the plaintiff as a result of the defendant's breach of duty." (cleaned up)); *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (discussing the four elements of negligence); *Jeffries v. Amery Leasing, Inc.*, 698 So. 2d 368, 370–71 (Fla. Dist. Ct. App. 1997) (listing the elements of negligence as "duty of care, breach of that duty, causation[,] and damages").  The plaintiff bears the burden of establishing all four elements by a preponderance of the evidence.  *See Kellner v. NCL (Bah.), Ltd.*, 753 F. App'x 662, 664–65 (11th Cir. 2018).

At the time the complaint was filed, "tort liability in Florida [wa]s premised on pure comparative negligence," requiring the factfinder to "apportion fault between the plaintiff, defendant, and any third parties alleged to have been at fault" and to "render an award based on a defendant's percentage of fault in causing an injury."  *Williams v. Davis*, 974 So. 2d 1052, 1061 n.10 (Fla. 2007); *accord* Fla. Stat. § 768.81(3) ("In a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and

several liability.").[6]  A defendant asserting comparative negligence as a defense must

establish the plaintiff's negligence by a preponderance of the evidence.  *See Bongiorno*

*v. Americorp, Inc.*, 159 So. 3d 1027, 1029 (Fla. Dist. Ct. App. 2015) ("Comparative

negligence is an affirmative defense; thus, the party asserting the defense bears the

burden of proving that the negligence of the other party was a cause of the accident.").

As to loss of consortium, Florida law provides that "the wife of a husband

injured as a proximate result of the negligence of another shall have a right of action

against that same person for her loss of consortium." *Gates v. Foley*, 247 So. 2d 40, 45

(Fla. 1971).  The "right of action is a derivative right" such that the wife "may recover

only if her husband has a cause of action against the same defendant." *Id.*; *accord*

*Faulkner v. Allstate Ins. Co.*, 367 So. 2d 214, 217 (Fla. 1979) ("[The wife]'s claim for loss

of consortium is derivative in nature and wholly dependent on her husband's ability

to recover.").   In this context, "[c]onsortium means much more than mere sexual

relation and consists, also, of that affection, solace, comfort, companionship, conjugal

life, fellowship, society[,] and assistance so necessary to a successful marriage." *Gates*,

247 So. 2d at 43.

### B. Duty and Breach

For Florida negligence claims, "[d]uty exists as a matter of law and is not a

---

[6] On March 24, 2023, Florida switched from a pure-comparative-negligence system to a modified-comparative-negligence system.  *See* Fla. Stat. § 768.81(6) ("In a negligence action to which this section applies, any party found to be greater than [fifty] percent at fault for his or her own harm may not recover any damages."); *Gonzalez v. Seabest, Inc.*, No. 22-cv-62403-ALTMAN/Strauss, 2024 U.S. Dist. LEXIS 141014, at *45 n.7 (S.D. Fla. Aug. 7, 2024) ("On March 24, 2023, Florida added subsection (6) to [section] 768.81.  That new subsection provides that a plaintiff who was more than fifty[ ]percent at fault cannot recover anything from the defendant.").

factual question for a jury to decide." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014) (alteration adopted) (quoting *McCain v. Fla. Power Corp.,* 593 So. 2d 500, 503 (Fla. 1992)). Florida law requires "[a]ny person operating a vehicle upon the streets or highways within the state" to "drive the [vehicle] in a careful and prudent manner . . . so as not to endanger the life, limb, or property of any person." Fla. Stat. § 316.1925(1). Florida law also requires a driver who is "about to enter or cross a highway from an alley, building, private road[,] or driveway" to "yield the right-of-way to all vehicles approaching on the highway to be entered which are so close thereto as to constitute an immediate hazard." Fla. Stat. § 316.125(1). In addition, Florida law generally provides that "[e]very person propelling a vehicle by human power has all of the rights and all of the duties applicable to the driver of any other vehicle." Fla. Stat. § 316.2065(1).

On the day of the incident, Ms. Browning owed a duty of care to Mr. Eason to operate the USPS vehicle in a careful and prudent manner and to yield the right-of-way to Mr. Eason, an approaching cyclist who constituted an immediate hazard as Ms. Browning turned out of the driveway onto South Tropical Trail. *See* Fla. Stat. §§ 316.125(1), 316.1925(1). Likewise, Mr. Eason owed a duty of care to Ms. Browning to operate his bicycle in a careful and prudent manner on the road. *See* Fla. Stat. §§ 316.125(1), 316.2065(1).

Ms. Browning persuasively testified that before she turned out of the private driveway, she looked both ways but did not complete the turn after looking both ways. (Dkt. 101 at 73, 76–77.) Instead, she checked her side view mirror. (*Id.*) After

checking her mirror, Ms. Browning looked to the right and proceeded to turn.  (*Id.*)
She did not look to the left again and consequently did not see Mr. Eason approaching
from her left.  (*Id.*)  Indeed, she did not see Mr. Eason until she exited her vehicle and
saw him on the ground.  (*Id.* at 77–78, 80.)  However, Ms. Browning was familiar with
the area and knew that cyclists and pedestrians frequented it.  (*Id.* at 63–64.)
Moreover, the court deems persuasive Mr. Cintron's testimony, (*e.g.*, *id.* at 216, 220),
and the findings in his disciplinary report, (Dkt. 99-23 at 1).  Accordingly, upon
consideration of the trial evidence, the court concludes by a preponderance of the
evidence that Ms. Browning breached her duty of care to Mr. Eason by failing to yield
the right-of-way, failing to exercise reasonable caution in turning out of the private
driveway onto the main roadway, and otherwise failing to drive in a careful and
prudent manner immediately before the accident.  *See Guerra v. United States*, 690 F.
Supp. 3d 1357, 1366 (M.D. Fla. 2023) (making conclusions of law concerning the duty
and breach elements of a Florida negligence claim in an FTCA case and "find[ing] by
a preponderance of the evidence that" a government employee "breached her duty to
operate [her] vehicle safely").

## C. Causation

Under Florida law, Plaintiffs bear the burden to establish a "reasonably close
causal connection" between the defendant's breach and the plaintiff's injury.  *Sutton v.
Wal-Mart Stores E., LP*, 64 F.4th 1166, 1169 (11th Cir. 2023) (quoting *Williams*, 974 So.
2d at 1056).  "Florida courts follow the more likely than not standard of causation and

require proof that the negligence probably caused the plaintiff's injury." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).  Thus, to prove causation, Plaintiffs "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result": a "mere possibility of such causation is not enough." *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (quoting *Gooding*, 445 So. 2d at 1018).

Mr. Eason designated Drs. Reiter and Campbell as hybrid experts pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).  *See SB Holdings I, LLC v. Indian Harbor Ins. Co.*, No. 20-14729, 2021 U.S. App. LEXIS 25862, at *7 n.6 (11th Cir. Aug. 27, 2021) ("The term 'hybrid witness' refers to certain types of individuals, such as treating physicians, who are exempt from the disclosure requirements for retained experts because their testimony primarily concerns personal observations made during the course of rendering their professional services.").  Under Rule 26(a)(2)(C), a treating physician may offer causation opinions, even without a Rule 26(a)(2)(B) expert report, so long as the opinions are "based on information gathered during the course of [the p]laintiff's medical treatment." *Levine v. Wyeth, Inc.*, No. 8:09-cv-854-T-33AEP, 2010 U.S. Dist. LEXIS 76000, at *5 (M.D. Fla. June 25, 2010) (citing *McGuire v. Davis*, 437 F.2d 570, 572–73 (5th Cir. 1971)); *accord Britt v. Wal-Mart Stores E., LP*, 599 F. Supp. 3d 1259, 1263 (S.D. Fla. 2022) ("Physicians who form their causation opinions during treatment can offer those opinions under Rule 26(a)(2)(C)—even without a Rule 26(a)(2)(B) report."); *Donaldson v. United States*, No. 6:09-cv-1049-Orl-28GJK, 2011

U.S. Dist. LEXIS 50267, at *3 (M.D. Fla. May 11, 2011) (permitting a treating
physician to testify "on the issue of causation so long as [the physician]'s opinion was
formed during the course of examination and treatment").

As the factfinder in a bench trial, the district court makes credibility
determinations regarding expert testimony and weighs conflicting evidence to decide
issues. *See Hatt 65, LLC v. Kreitzberg*, 658 F.3d 1243, 1250 (11th Cir. 2011) ("The
district court [i]s in the best position to observe the witnesses and to gauge the relative
weight to afford their testimony."); *In re Chalik*, 748 F.2d 616, 619 (11th Cir. 1984)
("[T]he trial judge is best able to assess the credibility of the witnesses before him and
thus the evidentiary content of their testimony."); *see also Easkold v. Rhodes*, 614 So. 2d
495, 498 (Fla. 1993) ("[E]ven though the facts testified to by the medical expert were
not within the ordinary experience of the members of the jury, the jury was still free to
determine their credibility and to decide the weight to be ascribed to them in the face
of conflicting lay evidence." (alteration adopted and quotation omitted)). "Even when
expert testimony is unchallenged, the finder of fact is free to weigh the opinion, just as
it does with any other witness, and reject such testimony." *Dep't of Agric. & Consumer
Servs. v. Borgoff*, 35 So. 3d 84, 88 (Fla. Dist. Ct. App. 2010). Indeed, the factfinder "is
entitled to weigh the credibility of a medical expert and a lay witness, to reject the
expert testimony and base its verdict solely on conflicting lay testimony, or to reject
the plaintiff's claim entirely." *Republic Servs. of Fla., L.P. v. Poucher*, 851 So. 2d 866,
871 (Fla. Dist. Ct. App. 2003). Further, "the exact boundaries of each treating
physician's testimony may . . . be addressed with specific objections to specific

testimony in the context of trial." *Levine*, 2010 U.S. Dist. LEXIS 76000, at *6
(alterations adopted).

Additionally, the Florida Motor Vehicle No-Fault Law provides that Plaintiffs
"may recover damages in tort for pain, suffering, mental anguish, and inconvenience
because of bodily injury . . . only in the event that the injury . . . consists in whole or
in part of . . . [p]ermanent injury within a reasonable degree of medical probability,
other than scarring or disfigurement[, or s]ignificant and permanent scarring or
disfigurement." Fla. Stat. § 627.737(2)(b)–(c). Although the no-fault law "does not
define permanent injury, 'the determination of what constitutes a permanent injury
must, as a practical matter, be left to physicians trained in that profession.'" *Hunter v.
United States*, 739 F. Supp. 569, 574 (M.D. Fla. 1990) (quoting *Morey v. Harper*, 541 So.
2d 1285, 1288 (Fla. Dist. Ct. App. 1989), *overruled on other grounds by Weygant v. Fort
Meyers Lincoln Mercury*, 640 So. 2d 1092, 1094 (Fla. 1994)). Under the no-fault law,
"as long as part of the bodily injury arising out of the motor vehicle accident involves
a permanent injury within a reasonable degree of medical probability, the plaintiff can
recover noneconomic damages relating to his pain, suffering, mental anguish, and
inconvenience for all of the injuries related to the accident." *Wald v. Grainger*, 64 So.
3d 1201, 1207 (Fla. 2011) (internal quotation marks omitted); *accord Rolon v. Burke*,
112 So. 3d 118, 120 (Fla. Dist. Ct. App. 2013) (holding that a jury properly awarded
noneconomic damages for all injuries suffered by a plaintiff where the evidence
established that one injury was permanent). Whether an injury is permanent is
typically a factual issue. *See Cohen v. Pollack*, 674 So. 2d 805, 806 (Fla. Dist. Ct. App.

1996).

The court considers Mr. Eason's injuries to his left shoulder, brain, and cervical spine.[7] For each injury, the court discusses the relevant doctors' statements, evaluating their persuasiveness to resolve conflicts of opinion.

### 1. Mr. Eason's Left Shoulder

Upon consideration of the testimony given and exhibits admitted into evidence at trial, the court finds that as a result of the accident, Mr. Eason suffered two permanent injuries to his left shoulder: a recurrent rotator cuff tear and chronic acromioclavicular separation. To prove that the accident caused Mr. Eason to suffer permanent injuries to his left shoulder, Plaintiffs offered the testimony of Dr. Reiter as his treating physician. (Dkt. 102 at 5–85.) Defendant does not dispute that the accident caused the acromioclavicular separation but does dispute that it caused the rotator cuff tear. (Dkt. 112 at 17–19.) In support of its position, Defendant offered the testimony of Drs. Postma and Cifu. (Dkt. 103 at 110–52; Dkt. 106 at 16–58.) The court discusses the physicians' testimony and explains why Dr. Reiter's testimony was more persuasive in light of the other evidence adduced at trial.

### a. Dr. Reiter

As discussed previously, the medical records admitted into evidence show that

---

[7] Mr. Eason does not mention his thoracic spine in Plaintiffs' Proposed Findings of Facts and Conclusions of Law. (*See* Dkt. 111.) Mr. Eason mentions his back or lumbar spine in passing while arguing that the accident caused "life[-]changing pain and discomfort to his shoulder and cervical spine." (*Id.* at 8, 12, 15–16, 22–23). Therefore, to the extent that Mr. Eason seeks compensation for an alleged thoracic or lumbar spine injury, he has forfeited argument on the issue. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting that the court need not consider "perfunctory and underdeveloped" arguments because such arguments are forfeited).

Dr. Reiter treated Mr. Eason from July 12, 2021, to March 14, 2023, (*see* Dkt. 99-11), and that he performed a rotator cuff tear repair surgery on Mr. Eason's left rotator cuff on July 29, 2022, (Dkt. 99-19 at 29–30). When he testified, Dr. Reiter had been an orthopedic surgeon for fifteen years. (Dkt. 102 at 6.) He testified that during that time, he had performed about three thousand shoulder surgeries. (*Id.*)

As to the acromioclavicular separation, Dr. Reiter testified that during his initial visit with Mr. Eason, Mr. Eason's left shoulder showed an obvious deformity consistent with such a separation. (*Id.* at 10.) This testimony aligned with Dr. McCranels's earlier, January 25, 2021 diagnosis. (Dkt. 99-4 at 23.) Dr. Reiter also testified that Mr. Eason's acromioclavicular separation caused Mr. Eason's collarbone to elevate such that Dr. Reiter could "push the collarbone back down to where it belong[ed]." (Dkt. 102 at 17.) During his testimony, Dr. Reiter and Mr. Eason demonstrated to the court that Mr. Eason's acromioclavicular separation caused the left side of his collarbone to exhibit a raised bump not present on the right side and that the bump went away when Dr. Reiter pressed on it with his fingers and reappeared when Dr. Reiter stopped pressing down on it. (*Id.* at 39–42.)

Further, Dr. Reiter testified that Mr. Eason's MRI showed that his left rotator cuff had a partial thickness tear. (*Id.* at 12–13.) Dr. Reiter confirmed that he advised Mr. Eason to undergo acromioclavicular reconstruction and shoulder arthroscopy surgeries but that Mr. Eason initially preferred conservative care. (*Id.* at 15.) Dr. Reiter also confirmed that when Mr. Eason presented for a follow-up appointment on January 24, 2022, Dr. Reiter "wanted to repeat the MRI" because the injury had

occurred a year ago and that the new MRI revealed that the partial rotator cuff tear had become a full tear. (*Id.* at 17, 19–21.) Dr. Reiter also opined that the original MRI images were not as clear as the new MRI images, so Mr. Eason's partial rotator cuff tear could have initially been a full rotator cuff tear. (*Id.* at 22.) Dr. Reiter further credibly explained that given the absence of fatty atrophy around the tendon, Mr. Eason's rotator cuff tear was traumatic, as opposed to degenerative. (*Id.* at 26–27.)

Dr. Reiter testified that Mr. Eason eventually agreed to have the rotator cuff repair surgery because Dr. Reiter believed Mr. Eason's "pain was more rotator cuff related . . . and . . . although he was having symptoms from both . . . [it is] a lot of surgery to . . . have a rotator cuff repair [surgery] and acromioclavicular reconstruction [surgery]" on the same day. Trial Tr. Vol 2., 264:18–265:7. Dr. Reiter further testified that he was "hopeful that the rotator cuff repair would give [Mr. Eason] enough improvement in his symptoms" so that he would not "require the [acromioclavicular] ligament reconstruction." *Id.* at 265:7–10. Dr. Reiter confirmed that on July 29, 2022, he performed four procedures on Mr. Eason: (1) arthroscopic rotator cuff repair, (2) arthroscopic extensive debridement, (3) arthroscopic subacromial decompression, and (4) arthroscopic lysis of adhesions. *Id.* at 270:12–16.

According to Dr. Reiter, besides some postoperative swelling that Dr. Reiter drained, the surgery went well. Moreover, Mr. Eason was doing well with his physical therapy, and his ROM had improved to full ROM six months after the surgery. Accordingly, he was discharged by Dr. Reiter and told to follow up as needed. *Id.* at 273:1–14, 16–25, 274:1–7, 275:10–21, 276:20–277:9. About two months later, Dr.

Reiter testified, Mr. Eason followed up with him reporting that although Mr. Eason was doing okay, he "still ha[d] sharp pain over the shoulder with certain motions . . . [and] still ha[d] trouble sleeping at night." Mr. Eason's complaint caused concern for Dr. Reiter, so he referred Mr. Eason to get a new MRI, which showed that Mr. Eason's rotator cuff had torn again. *Id.* at 277:16–278:11, 279:22–280:2. Dr. Reiter recommended that Mr. Eason undergo a reverse shoulder replacement surgery because Mr. Eason's rotator cuff tear was recurrent. *Id.* at 280:3–10.

Based on his education, training, experience, and treatment of Mr. Eason, and within a reasonable degree of medical certainty, Dr. Reiter opined that Mr. Eason's recurrent left rotator cuff tear and chronic acromioclavicular separation are permanent injuries that will not heal without a reverse shoulder replacement and acromioclavicular ligament reconstruction. *Id.* at 288:7–289:2.

### b. Dr. Postma

Dr. Postma is a board-certified orthopedic surgeon retained by Defendant to rebut Dr. Reiter's permanency findings regarding Mr. Eason's left shoulder. Trial Tr. Vol. 3, 599:18–19, 600:11–12. Dr. Postma has practiced orthopedic surgery for at least twelve years and performs rotator cuff surgery as part of his practice. *Id.* at 599:23–24; 606:16–17. Dr. Postma also testified that to form his opinion in this case, he reviewed Mr. Eason's medical records, Mr. Eason's and Mrs. Radaszewski's deposition testimony, and the answer to the complaint. *Id.* at 611:16–18, 612:12–613:6. After reviewing these records, Dr. Postma opined that within a reasonable degree of medical certainty, Mr. Eason "sustained a [g]rade III [acromioclavicular] separation from the

- 40 -

accident, but he did not sustain a rotator cuff injury from the accident." *Id.* at 614:2–
5, 628:25–629:2, 634:8–15. He conceded that the X-ray taken at Holmes Regional and
an MRI taken by Mr. Eason's primary care physician, Dr. Crane, both showed his
acromioclavicular injury, and the MRI also showed a partial tear, but in his opinion,
it was a degenerative tear, not an acute partial tear caused by the accident. *Id.* at 615:6–
616:6. Dr. Postma further opined that Mr. Eason's rotator cuff was degenerative and
not acute because if Mr. Eason had an acute full rotator cuff tear, the full tear would
have shown on the MRI, and based on his review of the records, Mr. Eason healed
well and had a normal exam months after the accident. *Id.* at 620:4–9, 628:11–629:2.
Dr. Postma also disagreed with Dr. Reiter's opinion that the MRI images showing Mr.
Eason's tear were not clear. *Id.* at 617:6–8. Dr. Postma testified that he was unsure
how Mr. Eason's partial rotator cuff turned into a full rotator cuff tear. *Id.* at 619:13–
24. Dr. Postma conceded that radiologists can miss indicators and sometimes misread
scans. *Id.* at 631:10–24. For example, the X-ray of Mr. Eason's left shoulder taken at
Holmes Regional was misread as normal when it was not because it showed Mr.
Eason's acromioclavicular separation. *Id.* Dr. Postma further conceded that Dr.
Hermansdorfer's records indicate that on March 3, 2021, he thought Mr. Eason might
require surgical treatment to address the rotator cuff damage, even though Mr. Eason
proceeded with conservative care at that time. *Id.* at 635:16–23. (Dkt. 99-9 at 6.)

### c.  Dr. Cifu

Dr. Cifu is a board-certified physical medicine and rehabilitation physician

retained by Defendant to rebut Dr. Reiter's permanency findings regarding Mr.
Eason's left shoulder.  Trial Tr. Vol. 5, 824:6–825:1, 827:3–4, 830:12–14, 851:11–16.
He was also retained to opine concerning Mr. Eason's alleged traumatic brain and
cervical spine injuries.  *Id.* at 827:3–4, 830:12–14, 840:18–25, 842:5–844:9, 845:18–
846:3, 847:11–848:13.  Dr. Cifu has expertise in the area of concussion and brain
injuries.  *Id.* at 827:13–20, 828:18–24.  Dr. Cifu has practiced medicine for over thirty
years.  *Id.* at 826:25–827:1.  Dr. Cifu reviewed Mr. Eason's medical records, X-rays,
and MRIs to reach his opinions.  *Id.* at 834:18–835:13, 835:19–836:4.

As for Mr. Eason's shoulder, Dr. Cifu testified that Mr. Eason "was an
extremely healthy and very active gentleman who was involved in a bicycle-motor
vehicle . . . collision that resulted in acute trauma . . . involving his left shoulder." *Id.*
at 831:22–25.  Regarding Mr. Eason's rotator cuff tear, Dr. Cifu opined that the "tear
was related to the incident."  *Id.* at 851:11–16.  Dr. Cifu testified that he was not
completely sure if the accident caused the partial tear, but he conceded that at a
minimum, the accident "flared the tear and gave [Mr. Eason] shoulder discomfort."
*Id.*  Dr. Cifu also conceded that he is not an orthopedic surgeon and that an orthopedic
surgeon "who went in with an arthroscope" would "be most aware" of whether Mr.
Eason's partial rotator cuff tear was acute or chronic.  *Id.* at 854:3–9.

### d. Persuasiveness of Conflicting Testimony

In considering the conflicting testimony from Mr. Eason's treating physician
and Defendant's medical experts, as well as Mr. Eason's medical records, the court is

persuaded by Mr. Eason's medical records and Dr. Reiter's opinions as to causation
and permanency.    Dr. Reiter's opinions were based on a history of physical
examinations of Mr. Eason, the performance of the shoulder surgery, treatment of Mr.
Eason for approximately twenty months, and a thorough review of Mr. Eason's
medical records.    Mr. Eason complained of shoulder pain immediately after the
accident, and most of his treatment following the accident was for his shoulder pain.
(*See* Dkt. 99-1 at 3; Dkt. 99-2 at 12; Dkt. 99-4 at 2; Dkt. 99-9 at 5; Dkt. 99-11 at 23;
Dkt. 99-14 at 3; Dkt. 101 at 113.)

Defendant and Defendant's expert, Dr. Postma, conceded that the accident
caused Mr. Eason's acromioclavicular separation.    The court was also persuaded by
Dr. Reiter's in-court demonstration, which showed Mr. Eason's acromioclavicular
separation.

The court does not find persuasive Defendant's argument that the accident did
not cause Mr. Eason's partial or full rotator cuff tear.    (Dkt. 112 at 9.)    Dr. Reiter
persuasively maintained that the lack of fatty atrophy present around the tendon meant
that Mr. Eason's rotator cuff tear was traumatic and not degenerative.    Dr.
Hermansdorfer diagnosed Mr. Eason with a partial rotator cuff tear in his left shoulder
six weeks after the accident.    (Dkt. 99-9 at 6.)    The court finds that Dr. Hermansdorfer's
diagnosis occurred close to the time of the accident.    The evidence supports that Mr.
Eason tried to manage his partial rotator cuff tear with conservative treatment.    (*Id*.;
Dkt. 99-11 at 22, 24.)    However, after Dr. Reiter ordered a new MRI and found that
the partial tear was a full tear, Mr. Eason notified Dr. Reiter that his shoulder pain was

worsening, and he wanted to have the rotator cuff repair surgery. (Dkt. 99-11 at 18–19.) After the tear recurred, Dr. Reiter recommended that Mr. Eason undergo reverse shoulder replacement surgery. (*Id.* at 3.)

Dr. Reiter persuasively testified that a full rotator cuff tear could have been present initially and may have been missed because the images were not clear. Dr. Reiter's testimony also reflects that Mr. Eason's rotator cuff tear will not heal without a reverse shoulder replacement because the rotator cuff repair surgery failed. Dr. Postma conceded that radiologists can make mistakes when reading scans. In fact, he determined the radiologist at Holmes Regional made a mistake and missed the acromioclavicular injury present in the X-ray of Mr. Eason's left shoulder taken at Holmes Regional. He summarily concluded that the partial tear was degenerative. However, Dr. Cifu persuasively conceded that the partial tear was related to the incident, although he could not give an opinion as to whether Mr. Eason's partial tear was preexisting. Therefore, the court does not find Dr. Postma's testimony regarding Mr. Eason's partial rotator cuff tear more persuasive than Dr. Reiter's and Dr. Cifu's testimony.

Mr. Eason has met his burden by a preponderance of the evidence that the January 19, 2021 accident more likely than not caused permanent injuries to his left shoulder. *See, e.g.*, *Wald*, 64 So. 3d at 1206–07; *Gooding*, 445 So. 2d at 1018; *Sullivan v. Price*, 386 So. 2d 241, 243 (Fla. 1980) (finding the standard for permanent injury "clearly met" where the plaintiff exhibited a "permanent scar from the surgical insertion and removal of the pin in his shoulder"); *Porras v. United States*, No. 8:21-cv-

423-JSS, 2023 U.S. Dist. LEXIS 47796, at *90 (M.D. Fla. Mar. 21, 2023) (determining

that a plaintiff suffered a permanent injury when the evidence reflected that the

plaintiff's "right shoulder rotator cuff tear would not have healed on its own, absent

surgical intervention"); *Colbert v. United States*, No. 3:09-cv-998-J-20JRK, 2014 U.S.

Dist. LEXIS 185875, at *55 (M.D. Fla. Mar. 6, 2014) (finding the evidence sufficient

to show that a plaintiff suffered a permanent injury in the form of a labral tear in his

right shoulder requiring surgery).

### 2. Brain

Upon consideration of the evidence adduced at trial, the court concludes that

Mr. Eason has not proven by the preponderance of the evidence that he suffered a

traumatic injury to his brain.[8]  To prove that the accident caused Mr. Eason to suffer

a traumatic brain injury, Mr. Eason offered the testimony of Dr. Lichtblau.  Trial Tr.

Vol. 2, 423–486.  To rebut this assertion, Defendant offered the testimony of Drs.

---

[8] Defendant offered the testimony of neuroradiologist Dr. Gonzalez to rebut the assertion that Mr. Eason suffered a traumatic injury to his brain.  Trial Tr. Vol. 4, 749–772.  Dr. Gonzalez stated that he reviewed Mr. Eason's January 19, 2021 brain CT scan, March 4, 2021 brain MRI, and April 24, 2021 brain MRI.  *Id.* at 759:11–17.  He opined that based on his reviews of these scans, Mr. Eason's brain showed chronic, rather than acute, abnormalities.  *Id.* at 760:11–17.  However, Dr. Gonzalez did not confirm that he reached this opinion within a reasonable degree of medical certainty, *id.* at 749–772, and the parties do not mention Dr. Gonzalez in their proposed findings of fact and conclusions of law, (*see* Dkts. 111, 112).  Additionally, Defendant seeks to rely on biomechanical engineer Dr. Cummings to rebut the assertion that Mr. Eason suffered a traumatic brain injury.  (Dkt. 112 at 15.)  Dr. Cummings stated that he reviewed Mr. Eason's medical records, Dr. Kadiyala's report, and Dr. Gonzalez's report to create a reconstruction of the accident.  Trial Tr. Vol. 4, 781:6–784:14.  Based on his review of those materials and his accident reconstruction test, Dr. Cummings opined that to a degree of biomechanical certainty based on the forces and accelerations of the crash, it is very unlikely that Mr. Eason lost consciousness.  *Id.* at 792:5–6; 803:12–25.  However, Dr. Cummings conceded that he cannot diagnose patients, and therefore, he cannot say that Mr. Eason definitively did not suffer a head injury.  *Id.* at 795:15–25.  Therefore, the court does not consider these opinions persuasive, considering the other persuasive testimony from medical doctors and the medical record evidence.

Herkov and Cifu.  Trial Tr. Vol. 3, 550–599; Trial Tr. Vol. 5, 824–866.  The court discusses the physicians' testimony and explains why Dr. Lichtblau was less persuasive than Drs. Herkov and Cifu considering the other evidence presented at trial.

### a.  Dr. Lichtblau

Dr. Lichtblau is a board-certified physician who specializes in two fields: (1) physical medicine and rehabilitation and (2) brain injuries.  Trial Tr. Vol. 2, 423:14–15, 428:2–4, 429:16–24.  He was retained to prove that Mr. Eason suffered a traumatic brain injury from colliding with the mail truck.  *Id*.  Dr. Lichtblau has practiced medicine in Florida for thirty-five years.  *Id*. at 424:11–14.  Dr. Lichtblau testified that he treats patients with traumatic brain injuries.  *Id*. at 423:16–19.  He emphasized that in this case, he did not establish a doctor-patient relationship with Mr. Eason and was instead asked by Mr. Eason's attorney to "define impairment, disability, and costs." *Id*. at 430:10–14.  Dr. Lichtblau testified that he reviewed Mr. Eason's medical records to form his opinions in this case.  *Id*. at 435:12–436:4.

After reviewing these materials, Dr. Lichtblau opined that within a reasonable degree of medical certainty, Mr. Eason suffered a mild traumatic brain injury and a concussion because of the accident.  *Id*. at 438:5–11, 440:14–20.  Dr. Lichtblau concluded that Mr. Eason had a mild traumatic brain injury based on the "ecchymosis" around Mr. Eason's left eye in a photograph, a quantitative EEG test that Mr. Eason had had at Ethos, and medical records showing that Mr. Eason had a "Glasgow Coma Scale of between [thirteen] and [fifteen] . . . and . . . was foggy less than [twenty-four] hours [after the accident]."  *Id*. at 439:5–440:6, 470:8–15, 482:9–13.

According to Dr. Lichtblau, an EEG test "measures brain electricity . . . based on the volume of the neurons," and if an EEG result "falls outside the norm, it is considered . . . abnormal." *Id.* at 470:16–23.

Dr. Lichtblau conceded that he had not seen EEG results for Mr. Eason's brain before the accident to compare to those produced at Ethos after the accident. *Id.* at 471:23–25. Dr. Lichtblau agreed that to the extent Mr. Eason has a brain injury, it is attributable to the general aging process. *Id.* at 469:25–470:15. However, Dr. Lichtblau maintained that because of the accident, Mr. Eason suffered a mild traumatic brain injury, which has caused "a permanent aggravation of [a] preexisting condition that" all individuals experience as they "get older." *Id.* at 470:3–15. Dr. Lichtblau opined that Mr. Eason likely did not lose consciousness. *Id.* at 474:17–21. Based on the injury to Mr. Eason's eye and his complaints of headaches and sensitivity to light and sound, Dr. Lichtblau determined that Mr. Eason had a concussion; however, the doctor conceded that no medical official at Holmes Regional nor Mr. Eason's primary care physician, Dr. Crane, diagnosed Mr. Eason with a concussion. *Id.* at 478:19–479:22, 480:3–6, 18–20. Dr. Lichtblau also conceded that Mr. Eason did not see a neurologist at Ethos. *Id.* at 481:5–6, 14–16. Instead, Mr. Eason saw a pain management doctor in February 2021, and when Dr. Lichtblau talked to the doctor, the doctor told him that he had recommended a twelve-week program to Mr. Eason, but Mr. Eason did not return for a follow-up. *Id.* at 481:18–23.

### b.  Dr. Herkov

Dr. Herkov is a board-certified clinical psychologist and neuropsychologist retained by Defendant to rebut Dr. Lichtblau's causation and permanency determinations regarding Mr. Eason's alleged brain injury.  Trial Tr. Vol. 3, 550:16, 552:19–24, 559:16–18.  Dr. Herkov testified that if a physician wants to diagnose a neurocognitive disorder, "the diagnostic criteria require[] some cognitive assessment, preferably neuropsychological testing."  *Id.* at 556:24–557:3.  Dr. Herkov explained that neurocognitive means "how the brain is functioning in terms of its activities, attention, concentration, [and] memory."  *Id.* at 572:23–573:1.  Dr. Herkov further testified that "diagnostic criteria set[] out what it takes to have a diagnosis," and he identified the Diagnostic and Statistical Manual of Mental Disorders (DSM) as "the standard in the [United States]."  *Id.* at 557:4–14.  According to Dr. Herkov, the DSM is the authoritative source in establishing diagnostic criteria for psychiatrists and psychologists in the United States, and insurance companies require the numbers associated with a DSM diagnosis for reimbursement.  *Id.* at 564:22–565:4.  Dr. Herkov explained that according to the DSM, a neurocognitive disorder is "a state of cognitive impairment."  *Id.* at 574:24–575:2.

To formulate his opinions in this case, Dr. Herkov reviewed Plaintiffs' complaint, as well as discovery materials, including deposition testimony, Mr. Eason's answers to interrogatories, and Mr. Eason's medical records and brain scans.  *Id.* at 560:7–13, 562:10–14.  After reviewing these materials, Dr. Herkov opined that the medical records do not suggest that Mr. Eason had a traumatic brain injury at the time

of the accident.  *Id*. at 562:22–563:4.  Dr. Herkov further opined that no evidence from

the medical records suggests that Mr. Eason suffers a neurocognitive disorder due to a

traumatic brain injury.  *Id.*  Dr. Herkov stated that these opinions were within a

reasonable degree of psychological probability.  *Id*. at 562:22–23, 581:14–15.

> Dr. Herkov stated that for a traumatic brain injury diagnosis, the DSM requires

>> the symptoms . . . to be present at the time of the
>> event . . . so seeing [Mr. Eason's] medical records from the
>> accident scene [and] from [Holmes Regional] that day are
>> much more important in terms of diagnosing [a traumatic
>> brain injury] than a medical record a month or a year or
>> three years later because if you [do not] have those
>> symptoms at the time [of the event], then by definition you
>> [do not] have a [traumatic brain injury] from that event.

*Id*. at 563:11–18.  Dr. Herkov further testified that the DSM provides a list of possible

symptoms to diagnose someone with a neurocognitive disorder caused by a traumatic

brain injury.  *Id*. at 563:19–564:1, 565:16–17.  Dr. Herkov stated that according to the

DSM, the criteria for diagnosing a traumatic brain injury are "an impact to the head

or other mechanisms of rapid movement or displacement of the brain within the

skull . . . with one or more of the following . . . a loss of consciousness[,] post-

traumatic amnesia[,] disorientation or confusion[,] or some neurological sign, such as

a positive imaging study."  *Id*. at 565:16–24.  Dr. Herkov explained that someone with

those symptoms will meet the criteria of having a traumatic brain injury.  *Id*. at  566:1–

3.  However, Dr. Herkov testified, the analysis does not end there because according

to the DSM, for someone to be diagnosed with a neurocognitive disorder caused by a

traumatic brain injury, the individual must have "cognitive impairments present

immediately after the occurrence of the traumatic injury or immediately after recovery of consciousness [that] persist[s] past the post[-]acute period." *Id.* at 566:1–11.

After applying the DSM's diagnostic criteria to Mr. Eason's medical records, Dr. Herkov testified that according to the paramedic records of the accident, Mr. Eason denied losing consciousness and had a perfect Glasgow Coma Scale score, meaning that Mr. Eason did not exhibit any disorientation or confusion. *Id.* at 566:19–567:5. According to Dr. Herkov, the Glasgow Coma Scale is a "tool that medical personnel use to measure disorientation and confusion, [which is] the second criterion that is required" for a person to be diagnosed with a traumatic brain injury. *Id.* The paramedic records further stated that Mr. Eason was alert and oriented to person, time, and place, further suggesting to Dr. Herkov that Mr. Eason did not have a traumatic brain injury. *Id.* at 567:6–11. Dr. Herkov testified that Mr. Eason denied loss of consciousness at Holmes Regional, and there is no report of any cognitive issues in the Holmes Regional records. *Id.* at 568:15–24. Dr. Herkov further testified that the CT scan taken at Holmes Regional showed chronic microvascular ischemic disease changes and no evidence of acute intracranial hemorrhage, infarction, or hydrocephalous, indicating that "while there [we]re some issues with [Mr. Eason's] brain before this event, [there is] nothing that shows anything[] is acute." *Id.* at 568:24–569:11.

Dr. Herkov also opined that Mr. Eason did not show symptoms of post-traumatic amnesia because he was able to describe what happened to him at Holmes Regional and during his deposition testimony. *Id.* at 570:25–571:10. Dr. Herkov

testified that a person's failure to "remember every single detail" does not compel a diagnosis of post-traumatic amnesia. *Id.* at 571:9–15. Post-traumatic amnesia also "is not just missing a small detail . . . . It would be . . . significant blocks of time that are missing," according to Dr. Herkov. *Id.*

Dr. Herkov testified in the alternative that even if Mr. Eason had traumatic brain injury symptoms, the DSM "has a chart that rates the severity of a [traumatic brain injury], and [the chart] is important for [the] course [of treatment] and prognosis." *Id.* at 570:4–12. The chart defines a mild traumatic brain injury "as a loss of consciousness [for] less than [thirty] minutes, post-traumatic amnesia [for] less than a day, [and] alteration of consciousness [for] less than a day" with a Glasgow Coma Scale score between thirteen and fifteen. *Id.* at 570:13–16. Dr. Herkov maintains that Mr. Eason's medical records do not exhibit any of these indicators. *Id.* at 570:8–24. Based on his review of these records, Dr. Herkov concluded that even if Mr. Eason did have a traumatic brain injury, he would have a mild traumatic brain injury. *Id.* According to Dr. Herkov, a mild traumatic brain injury is essentially a concussion, and people with concussion symptoms "tend to resolve quickly with complete recovery in [three] to [twelve] months." *Id.* at 571:25–572:7.

Dr. Herkov testified that even if Mr. Eason was diagnosed with a mild traumatic brain injury, Mr. Eason could not have a neurocognitive disorder caused by the traumatic brain injury unless "neurocognitive symptoms and functional limitations persist after [a mild traumatic brain injury] . . . despite treatment of other . . . potential causes." *Id.* at 572:8–22. As such, if traumatic brain injury symptoms persist or there

is documented subsequent neurocognitive deterioration, the DSM requires "consideration of other potential causes of neurocognitive symptoms and functional limitations, including depression and other disorders." *Id.* Dr. Herkov explained that if someone is not recovering from a mild traumatic brain injury, the next step is to "look at [the] diagnosis for depression or [the] diagnosis for an anxiety disorder or [the] diagnosis for [post-traumatic stress disorder]" because "all of those diagnoses contain cognitive symptoms." *Id.* at 573:2–10.

Even if Mr. Eason were suffering from a mild traumatic brain injury, Dr. Herkov testified that none of Mr. Eason's medical providers ruled out other potential causes of neurocognitive deterioration to confirm that Mr. Eason has a neurocognitive disorder because of the mild traumatic brain injury. *Id.* at 573:2–23. In Dr. Herkov's words, "even though a person may have a [mild traumatic brain injury] at one point[, that does not] mean that [the person has] a neurocognitive disorder." *Id.* at 574:17–19. According to Dr. Herkov, the DSM relates a neurocognitive disorder to "a number of" health conditions. *Id.* at 574:24–575:2–8. For example, Dr. Herkov testified that a neurocognitive disorder can be caused by Alzheimer's disease, human immunodeficiency virus, Parkinson's disease, or a mild traumatic brain injury, "but the basic criteria for a neurocognitive disorder [are] the same for everyone. What changes is the etiology, the cause of [the neurocognitive disorder]." *Id.* Dr. Herkov further testified that determining the cause of an individual's mild neurocognitive disorder requires consideration of various factors, including the individual's attentiveness or concentration, the individual's subjective concern of cognitive

impairment, and a qualified clinical assessment such as objective neuropsychological testing. *Id.* at 575:9–25. Dr. Herkov related these diagnostic criteria to the medical records he reviewed and testified that none of Mr. Eason's medical records contain a sufficient neuropsychological cognitive assessment of Mr. Eason. *Id.* at 576:1–8. Dr. Herkov conceded that during Mr. Eason's March 4, 2021 visit to Ethos, Mr. Eason had one "test that [could] be considered a neuropsychological test"—the "trail-making test." *Id.* at 577:14–22; *see* Dkt. 99-8 at 183. However, Dr. Herkov asserted that the test "did not indicate any sort of impairment" in Mr. Eason's function. Trial Tr. Vol. 3, 577:19–22. Dr. Herkov also stated that given the absence of neuropsychological cognitive assessments in Mr. Eason's medical records, there "is not enough to diagnose [Mr. Eason with] any sort of underlying neurocognitive disorder in the areas [he is] complaining about, such as [his] memory, . . . attention, . . . [and] concentration." *Id.* at 578:23–7. Dr. Herkov concedes that his opinions in this case are limited to his review of the medical records since he has not evaluated or spoken with Mr. Eason. *Id.* at 590:9–17, 593:6–22.

### c. Dr. Cifu

Dr. Cifu opined that within a reasonable degree of medical certainty, Mr. Eason did not suffer a traumatic brain injury or concussion. Trial Tr. Vol. 5, 840:18–25. According to Dr. Cifu, the EEG tests Mr. Eason received at Ethos were not reliable because they were nonscientific tests that provided "generic findings that [do not] link with any diagnosis so [the tests have not] been validated . . . to produce an outcome." *Id.* at 836:1–837:8. Dr. Cifu explained that "validated" means that "someone

has . . . [looked at the findings] in an objective way and said that this test can be done
in a standard format and the . . . results of th[e] test can be interpreted in a standardized
format." *Id.* at 837:21–25. Dr. Cifu further explained that the best time to diagnose a
traumatic brain injury is not months after the accident that allegedly caused it. *Id.* at
838:11–17. Instead, a healthcare provider should look at acute medical records, such
as Mr. Eason's records from the paramedics and Holmes Regional, and discern
whether those records indicate memory loss or an altered state of consciousness.
According to Dr. Cifu, if Mr. Eason did not have a concussion to begin with as
identified in the paramedic and Holmes Regional records, he would not "get a delayed-
reaction concussion two months later." *Id.* at 838:18–839:3.

### d. Persuasiveness of Conflicting Testimony

In considering the conflicting testimony from the parties' medical experts in
conjunction with Mr. Eason's medical records, the court is persuaded by the
statements of Drs. Herkov and Cifu. The court does not find persuasive Mr. Eason's
position that he suffered a mild traumatic brain injury on the day of the collision. (*See*
Dkt. 111 at 13, 22.) Mr. Eason's medical records do not convince the court that he
suffered a mild traumatic brain injury.

To begin with, a nurse, Nurse Burgess—not a neurologist—diagnosed Mr.
Eason with a traumatic brain injury over a month after the accident. Dr. Lichtblau
conceded that Mr. Eason did not meet with a neurologist at Ethos; instead, when Mr.
Eason finally saw a doctor, it was a pain management doctor, and Mr. Eason did not
return to see that doctor. Further, Nurse Burgess's diagnosis conflicts with Mr.

- 54 -

Eason's medical records closest in time to the collision. Specifically, Nurse Burgess's traumatic brain injury diagnosis conflicts with paramedic records stating that Mr. Eason denied losing consciousness and did not have any neurological abnormalities. (Dkt. 99-1 at 2.) The nurse's diagnosis also conflicts with Mr. Eason's score of fifteen out of fifteen on the Glasgow Coma Scale, as evidenced in the paramedic and Holmes Regional records. (*Id.* at 2; Dkt. 99-2 at 31.) The court is persuaded by the testimony from Drs. Herkov and Cifu that diagnosing a traumatic brain injury entails examining the subjective symptoms reported, and objective tests performed, closest in time to the traumatic event.

In addition, Mr. Eason complained about the care he was receiving at Ethos to his chiropractor, Dr. McCranels, eleven days after starting treatment because he kept having virtual appointments with Nurse Waicus and wanted to see a neurologist for an in-person evaluation. According to Mr. Eason, the healthcare providers at Ethos seemed "more concerned with getting all of the information surrounding the motor vehicle crash with very little emphasis on his symptoms." (Dkt. 99-4 at 120, 151.) Mr. Eason's complaints persisted, and over a month into his treatment at Ethos, he did not feel like any significant treatment had been offered. (*Id.* at 120, 151, 221.) Due to Mr. Eason's complaints, Dr. McCranels ordered a brain MRI and recommended that Mr. Eason find a neurologist willing to treat a patient involved in a motor vehicle crash. (*Id.* at 221.) When Mr. Eason went to Viera Diagnostic on March 4, 2021, and Dr. Gentles performed the MRI, the MRI showed no acute intracranial pathology. (Dkt. 99-7 at 5.) Dr. Gentle's findings are consistent with the results of Mr. Eason's brain

CT scan conducted at Holmes Regional. (Dkt. 99-2 at 14 (finding no acute intraparenchymal hemorrhage).)

Even if the Ethos records showed that Mr. Eason had a mild traumatic brain injury, Nurse Waicus conducted a neurological evaluation at Mr. Eason's last appointment, and only one out of the eighteen tests performed revealed abnormal results. (Dkt. 99-8 at 74–75.) Further, the court does not find the EEG results persuasive because Dr. Hubbard stated that Mr. Eason's findings could be indicative of other conditions, yet he was summarily diagnosed with a traumatic brain injury without having ruled out any other conditions that could have caused cognitive impairment. (*Id.* at 182.) Dr. Cifu persuasively testified that the EEG test was not reliable because the test provided generic findings that did not link with a diagnosis.

The court is also persuaded by the DSM's criteria in diagnosing neurocognitive disorder caused by a traumatic brain injury. Dr. Herkov persuasively testified that the DSM is an authoritative source in establishing diagnostic criteria for psychiatrists and psychologists in the United States. Dr. Herkov persuasively testified, as well, that the DSM requires healthcare providers to rule out other possible causes of neurological impairment before diagnosing a neurocognitive disorder as a result of the mild traumatic brain injury. He explained that a neurocognitive disorder can occur because of conditions other than a mild traumatic brain injury, such as Alzheimer's disease. Therefore, the court is persuaded by his opinion that it is important to exclude other medical conditions before attributing a neurological, cognitive disorder to a specific condition. That said, the Ethos records are not persuasive enough to prove that Mr.

Eason, more likely than not, had a neurocognitive disorder because of the accident, as Dr. Herkov convincingly testified that insufficient neuropsychological cognitive assessments had been performed to support such a diagnosis for Mr. Eason.

Additionally, the court agrees with Dr. Herkov that Mr. Eason did not show signs of post-traumatic amnesia because Mr. Eason could recall the accident at his deposition. Dr. Herkov's conclusion is supported by, and consistent with, Mr. Eason's medical records, as Mr. Eason repeatedly provided consistent and detailed summaries of the accident to his medical providers. (Dkt. 99-1 at 6; Dkt. 99-2 at 12; Dkt. 99-4 at 2; Dkt. 99-9 at 5; Dkt. 99-11 at 23; Dkt. 99-14 at 3.) Although Mr. Eason could not remember everything about that day, he shared a detailed recollection of events through trial testimony that the court largely credits. Trial Tr. Vol. 1, 107:14–110:25. This evidence further supports the opinions of Drs. Herkov and Cifu. Moreover, Dr. Lichtblau persuasively testified that Mr. Eason did not lose consciousness after the accident. Dr. Lichtblau's testimony is consistent with Ms. Browning's testimony that she spoke to Mr. Eason seconds after the impact, Trial Tr. Vol. 1, 91:1–16, which the court credits. Dr. Lichtblau conceded that Mr. Eason's brain has been affected by the general aging process, Trial Tr. Vol. 2, 470:10–12, and that Dr. Lichtblau did not see a previous EEG test before the accident to compare to the one taken at Ethos.

For all these reasons, the court concludes that Mr. Eason has not met his burden of establishing that the January 19, 2021 accident more likely than not caused a traumatic injury to his brain.

### 3.  Cervical Spine

Upon consideration of the evidence presented at trial, the court concludes that Mr. Eason has not shown by the preponderance of the evidence that he suffered an injury to his cervical spine.  To prove that the accident caused Mr. Eason to suffer an injury to his cervical spine, Mr. Eason offered the testimony of his treating physician Dr. Campbell.  Trial Tr. Vol. 3, 335–357.  To rebut this assertion, Defendant offered the testimony of Drs. McGrail and Cifu.  Trial Tr. Vol. 5, 842–898.  The court considers the physicians' testimony and explains why Defendant's position is more convincing on this issue.

### a.  Dr. Campbell

Medical records show that Dr. Campbell treated Mr. Eason from October 18, 2023, to January 17, 2024.  Dr. Campbell is a board-certified orthopedic and spinal surgeon.  Trial Tr. Vol. 2, 336:20–23.  Dr. Campbell has practiced orthopedic spinal surgery for thirty-three years.  *Id.* at 336:17–18.  Dr. Campbell testified that the cervical spine is in the neck region.  *Id.* at 336:6–12.  He explained that C1 is the top vertebra: the head sits on that vertebra.  *Id.* at 342:10–15.  He further explained that each vertebra "has a different name or number, but generally[,] [doctors] start at the top at C1 and go to bottom at C7" for the cervical spine area.  *Id.*  Dr. Campbell testified that the discs contained in the cervical region are made of cartilage, protein, and other materials and serve as a cushion to the vertebrae.  *Id.* at 342:17–18.  He further testified that the shoulder includes nerves from the C4 to C5 nerve roots, and "the parts of the shoulder that hook the shoulder to the body get some cross[]over neurological supply

from several parts of the spine itself." *Id.* at 343:10–24.

Dr. Campbell testified that Mr. Eason initially came to see him "for an opinion
related to Dr. Gomez's recommendation for interventional treatment with . . . [branch
block] injection therapy" into his cervical spine. *Id.* at 349:24–350:8. Dr. Campbell
further testified that Mr. Eason complained of neck and left shoulder pain during that
visit. *Id.* at 347:12–14, 16–21. Dr. Campbell's physical examination of Mr. Eason's
cervical region showed muscle spasm, tenderness in the left shoulder, limited ROM,
intact sensation, and a positive Spurling test. *Id.* at 351:17–22. Other than that, the
"rest of the examination was normal." *Id.* Dr. Campbell opined that Mr. Eason's "left
shoulder pain and the neck pain [had a] radiating pattern, meaning the pain . . . flowed
between the neck and shoulder," and Mr. Eason had neck pain from a problem in his
neck and shoulder pain from a problem in the shoulder. *Id.* at 348:4–12, 349:12–18.

During Mr. Eason's initial visit, Dr. Campbell reviewed three MRIs: two of Mr.
Eason's left shoulder and one of his cervical spine. *Id.* at 351:23–352:2. Based on his
review of these scans, Dr. Campbell testified that Mr. Eason "had a variety of problems
in [his] spinal column," including in his cervical spine discs. *Id.* at 352:5–15. When
asked if he could determine whether the cervical spine problems present in Mr. Eason's
MRI were degenerative or had some other cause, Dr. Campbell testified that he could
not make such a determination. *Id.* at 352:20–353:2. Specifically, Dr. Campbell stated
that "the findings on the MRI [did not] allow any date of onset to be made. Some of
the findings on the MRI, if not all of them, appear to have been in the stage of
progression over [Mr. Eason's] . . . adult life." *Id.*

Based on his review of Mr. Eason's scans and physical examination, Dr. Campbell testified that he agreed with Dr. Gomez's recommendation that Mr. Eason get branch block injections. *Id.* at 353:24–354:4. He further recommended that Mr. Eason get a new cervical MRI and X-ray. *Id.* at 354:4–5, 9–13. Dr. Gomez testified that Mr. Eason did not visit him in person again but had additional telemedicine appointments. *Id.* at 351:14–18. During Mr. Eason's last visit, on January 17, 2024, Dr. Campbell referred Mr. Eason to a pain medicine specialist for his spinal pain and a different orthopedic spine surgeon for further treatment. *Id.* at 356:10–14. Dr. Campbell did not testify that Mr. Eason suffered an acute permanent cervical spine injury or aggravation of a preexisting cervical spine injury. *Id.* at 335–357.

### b. Dr. McGrail

Dr. McGrail is a board-certified neurosurgeon that Defendant retained to rebut causation and permanency findings regarding Mr. Eason's alleged cervical spine injury. Trial Tr. Vol. 5, 867:21–22, 868:17–18; 873:18–875:3. Dr. McGrail has practiced neurosurgery for thirty years. *Id.* at 868:3–4. Dr. McGrail testified that he is the chairman of neurosurgery at MedStar Georgetown University Hospital, and in this role, he trains residents and neurosurgeons. *Id.* at 869:2–9. Dr. McGrail also testified that he sees patients with brain and spinal problems, and at least half of his practice focuses on spinal surgery. *Id.* at 870:9–16. According to Dr. McGrail, degenerative spine problems are the most common injuries he sees, especially in the aging population. *Id.* at 872:23–873:6.

Dr. McGrail testified that he reviewed Mr. Eason's medical records and radiographic images, the pleadings, deposition testimony, and expert reports to formulate his opinion in this case. *Id.* at 877:17–20., 878:21–24. Dr. McGrail further testified that he did not take Mr. Eason's personal history or conduct a physical examination of Mr. Eason. *Id.* at 877:21–878:1, 892:1–10. Dr. McGrail opined that within a reasonable degree of medical certainty, Mr. Eason did not suffer a cervical spine injury related to the accident, *id.* at 879:7–12, 886:1–2—Mr. Eason's disc bulges and herniations were not caused by the accident, *id.* at 883:3–21. Dr. McGrail reached this conclusion based on a review of Mr. Eason's medical records. Dr. McGrail testified that Mr. Eason's paramedic records show that he did not complain of any neck pain at the scene of the accident. *Id.* at 881:7–9. He further testified that the CT scan of Mr. Eason's spine taken at Holmes Regional "did not show any evidence of a traumatic injury. Specifically, there was no evidence of a cervical spine fracture or any evidence of dislocation or significant soft tissue injury." *Id.* at 881:20–882:1. According to Dr. McGrail, this result meant that the CT scan was "a negative study for trauma"; however, the scan did show "degenerative disc disease and bone spurring at multiple levels in the neck." *Id.* at 882:2–6. Dr. McGrail further testified that degenerative disc disease takes years to develop and is not related to trauma. *Id.* He also reviewed the MRI of Mr. Eason's cervical spine, which was taken on March 3, 2023. *Id.* at 882:16–23. According to Dr. McGrail, the MRI showed "a disc bulge at the [C4 to C5] level, which was impinging on the nerves on that level on both sides and a disc herniation [that was] osteophytic, with bone spurs, at the [C5 to C6] level

- 61 -

that was also causing narrowing of the neuroforamen." *Id.*

Dr. McGrail explained that disc herniations could be caused by trauma, but when he reviewed Mr. Eason's scans, the disc herniations "looked like a classic degenerative disc, especially because of the bone spurring associated with" degeneration. *Id.* at 883:9–15. Dr. McGrail opined based on the bone spurring that Mr. Eason's disc herniation was not related to his collision with the mail truck but was instead "secondary to degenerative disc disease." *Id.* Dr. McGrail explained that whereas "an acute disc herniation is a very painful event when it occurs," Mr. Eason did not complain of any cervical spine pain, as reported in the records from the scene of the accident and the initial evaluation in the emergency room. *Id.* at 883:16–23. Although Dr. McGrail approved of Dr. Gomez's surgical recommendation that Mr. Eason undergo a C5 to C6 discectomy and fusion, *id.* at 883:24–884:–5, Dr. McGrail did not agree with Dr. Gomez's opinion that the recommended surgery was needed due to the accident, *id.* at 884:5–20.

### c. Dr. Cifu

Dr. Cifu compared X-rays and MRIs taken before and after the accident and opined that within a reasonable degree of medical certainty, Mr. Eason's cervical spine had degenerative changes and moderate arthritis that had likely been there for a decade or longer. Trial Tr. Vol. 5, 842:5–844:9, 845:18–846:3, 847:11–848:13. Dr. Cifu further opined that the accident caused a muscular or soft tissue injury but did not cause changes to the arthritic or degenerative bone problems. *Id.* at 855:25–856:3. According to Dr. Cifu, degeneration "means to break down," and Mr. Eason's spine

"is a spine [that is] fairly typical for a gentleman in his early to mid [seventies]." *Id*. at 844:11–18.

### d. Persuasiveness of Testimony

Mr. Eason has not met his burden of proving that he more likely than not would have ongoing neck pain or be a candidate for cervical spine surgery but for the accident. (Dkt. 111 at 16.) Mr. Eason did not see Dr. Campbell until over two years after the accident. Further, Dr. Campbell did not testify that the accident caused Mr. Eason to suffer a permanent acute injury or aggravation of a preexisting spinal injury within a reasonable degree of medical certainty. In fact, Dr. Campbell persuasively testified that he could not tell the cause of Mr. Eason's cervical spine problems. Dr. Campbell further persuasively testified that the MRI results did not allow a date of onset to be identified, and some, if not all, of Mr. Eason's cervical spine symptoms appear to derive from the natural progression of Mr. Eason's life. The paramedic (Dkt. 99-1 at 3) and Holmes Regional (Dkt. 99-2 at 15) records persuade the court that Mr. Eason did not suffer an acute cervical spinal injury. Mr. Eason did not inform the paramedics that he was experiencing neck pain after the accident. (Dkt. 99-1 at 3 (stating that Mr. Eason did not describe head or neck pain and that his only complaint was his left shoulder).) The CT scan taken at Holmes Regional further supports Dr. Herkov's opinion because it showed degenerative changes and no evidence of a spinal fracture. (Dkt. 99-2 at 15.)

Dr. Cifu persuasively testified that based on his review of Mr. Eason's pre-accident and post-accident scans, Mr. Eason had degenerative changes and moderate

arthritis in his cervical spine that had likely been present a decade or longer.  Dr. Cifu
testified that based on his review of Mr. Eason's scans, the accident caused Mr. Eason
to suffer a soft tissue muscular injury.  Dr. Cifu did not opine concerning the nature of
soft tissue injury, explain why he believed the accident caused Mr. Eason to have soft
tissue injury, or discuss permanency of the injury.  Dr. McGrail testified that based on
his review of the CT scan taken at Holmes Regional, there was no evidence of
significant tissue injury.  Dr. Campbell did not opine as to a tissue injury.  Therefore,
the court is not persuaded by Dr. Cifu's testimony regarding this issue.

Dr. Campbell persuasively diagnosed Mr. Eason with degenerative disc disease
during his initial visit on October 18, 2023.  (Dkt. 99-15 at 10–11.)  Dr. Gomez
recommended that Mr. Eason undergo cervical spine surgery because the accident
caused nerve root trauma to his cervical spine, and Mr. Eason had no preexisting
history of similar symptoms.  (Dkt. 99-12 at 29.)  However, Dr. Gomez's opinion that
Mr. Eason had no preexisting symptoms conflicts with the other physicians'
persuasive testimony that Mr. Eason had preexisting degenerative injuries to his spine.
Dr. Campbell's records reflect that after he reviewed an X-ray of Mr. Eason's cervical
spine, he saw "extensive degenerative changes of the cervical spine . . . between C4
and C7."  (Dkt. 99-15 at 3.)  Dr. McGrail persuasively testified that he agreed with Dr.
Gomez's surgical recommendation, but he did not agree with Dr. Gomez's opinion
that the accident necessitated Mr. Eason's need for cervical spine surgery.  The court
does not agree with Dr. Gomez's opinion of the accident, either, and therefore finds
that Mr. Eason has not met his burden of proving by a preponderance of the evidence

that the January 19, 2021 accident caused him to suffer from a cervical spine injury.

### D. Damages

As Mr. Eason has met the other elements of his negligence claim, the court considers damages. With respect to damages, the court discusses Mr. Eason's past medical bills, future medical costs, and noneconomic damages.

#### i. Past Medical Bills

To recover for his past medical bills, Mr. Eason must establish by a preponderance of the evidence that the cost of his medical care was reasonable, and the care was necessarily or reasonably obtained. *See* Fla. Standard Jury Instruction (Civil) 501.3 (explaining that a claimant is entitled to the "reasonable value or expense of . . . medical care and treatment necessarily or reasonably obtained . . . in the past") (cleaned up). Treatment is necessarily or reasonably obtained if (1) "the charges are for treatment [that] the plaintiff sought for injuries at issue in [the] lawsuit, as opposed to treatment for some other condition," and (2) "the charges are for a reasonable amount." *Dungan v. Ford*, 632 So. 2d 159, 163 (Fla. Dist. Ct. App. 1994). Further, "[i]t is well established that the plaintiff in a personal injury suit has the burden to prove the reasonableness and necessity of medical expenses." *Albertson's Inc. v. Brady*, 475 So. 2d 986, 988 (Fla. Dist. Ct. App. 1985). "Although some jurisdictions consider evidence of the amount of a medical bill to be sufficient proof of reasonableness, many, including Florida, require something more." *Id.* "The patient's obligation is not to pay whatever the provider demands, but only a reasonable amount." *Columbia Hosp.*

*(Palm Beaches) L.P. v. Hasson*, 33 So .3d 148, 150 (Fla. Dist. Ct. App. 2010).  Thus, a plaintiff's burden to prove the reasonableness and necessity of medical expenses "requires more than just evidence of the amount of the bill to establish that reasonableness."  *E. W. Karate Ass'n, v. Riquelme*, 638 So. 2d 604, 605 (Fla. Dist. Ct. App. 1994).  Plaintiffs may satisfy their burden to prove the reasonableness and necessity of medical expenses "through expert witness testimony, [their] own lay testimony, or a combination of both."  *Roman v. Sos*, 393 So. 3d 1263, 1267 (Fla. Dist. Ct. App. 2024) (citing *Walerowicz v. Armand-Hosang*, 248 So. 3d 140, 145 (Fla. Dist. Ct. App. 2018)).

### a.  Undisputed Past Medical Bills

Defendant does not dispute the reasonableness or necessity of the medical bills that Mr. Eason incurred from Brevard County Fire Rescue, Holmes Regional Medical Center, Atlantic Orthopaedic Group, Dr. Gomez, OSI Health, Dr. Campbell, Elite Orthopedic & Spine Centers, Viera Diagnostic Center, NeuroSkeletal Imaging, Coastline Imaging, Ocala Anesthesia, and Brevard Physician Associates.  (*See* Dkts. 112, 112-1.)  Although Defendant does not challenge the reasonableness or necessity of the $8,182 Holmes Regional bill, it persuasively contends that there is no recoverable balance owed on the bill because Holmes Regional reduced the bill by $3,072.89 in adjustments, and Mr. Eason's health insurance paid the remaining balance of $5,110.10.  (Dkt. 112-1 at 3 (citing Dkt. 99-2 at 477–78).)  Therefore, after adjustments and insurance payments, the court concludes that there is no recoverable balance for the Holmes Regional bill.  Defendant further persuasively maintains that

there is no recoverable balance owed on the $1,079 Brevard Physician Associates bill because after personal injury protection payments, insurance payments, and adjustments, there is no remaining balance. (*Id.* at 2 (citing Dkt. 99-3 at 5).)

Regarding the remaining undisputed bills, the court agrees with the parties that the amount due is reasonable and that Mr. Eason's treatment was reasonably or necessarily obtained. *See* Trial Tr. Vol. 1, 147:8–16, 149:17–25, 150:12–17, 150:20–151:1, 152:10–15, 153:22–154:2, 154:6–11, 155:1–7, 155:9–19. After subtracting the non-recoverable bills undisputed by Defendant, the court finds that Mr. Eason is entitled to recover at least $33,084.97 ($817.40 plus $1,950 plus $1,249 plus $1,976 plus $7,092 plus $2,705.83 plus $195.74 plus $6,754 plus $10,345) in damages for his undisputed past medical bills.

### b. Disputed Past Medical Bills

Defendant persuasively maintains that the following past medical bills mentioned in Plaintiffs' Composite Exhibit 27 should be excluded as nonrecoverable because Plaintiffs did not offer into evidence the medical records corresponding with the bills: Infinity DME's bill ($3,250), Dr. Weiss's bill ($4,525), and Dr. Stadelman's bill ($525). (Dkt. 112 at 20–21.) A review of Plaintiffs' Second Amended Exhibit List shows that the medical record exhibits that correspond with these bills were not admitted into evidence. (*See* Dkt. 99 at 20 (stating that Exhibit 20 is the "Infinity DME Records subpoenaed by defense," Exhibit 24 is the "medical records from Dr. Stadelman," and Exhibit 25 is the "medical records from Dr. Weiss" (cleaned up)).) Mr. Eason cannot recover damages for these bills because he has not satisfied his

burden of establishing that the treatment received at these facilities was reasonably or necessarily obtained based on his collision with the mail truck. *See Dungan*, 632 So. 2d at 163; *Albertson's*, 475 So. 2d at 988; *E. W. Karate*, 638 So. 2d at 605.

Defendant argues that the court should not award Mr. Eason past medical bill damages for his Ethos bill ($10,505.60, (Dkt. 99-22 at 23–28), plus $8,520, (*id*. at 29–30), plus $8,755, (*id*. at 32–36), for a total outstanding balance of $27,780.60 before insurance payments and adjustments). (Dkt. 112 at 21.) Defendant asserts that Mr. Eason did not testify about the reasonableness and necessity of this treatment and that Drs. Herkov and Cifu testified that the testing Ethos performed was unreliable. (*Id*.) Defendant's arguments are not well taken for two reasons. First, Mr. Eason persuasively testified about the reasonableness and necessity of this treatment. *See* Trial Tr. Vol. 1, 157:3–24, 158:10–17. Second, the court has already explained that the proper inquiry to determine whether a plaintiff's medical treatment was reasonably or necessarily obtained is whether the charges are for treatment that the plaintiff sought for injuries at issue in the lawsuit. *See Dungan*, 632 So. 2d at 163. While the court and Defendant's experts found the Ethos records unpersuasive to establish that Mr. Eason more likely than not suffered a traumatic brain injury, the question of whether he suffered such an injury was at issue in this case. *See id*.

The court finds that Mr. Eason is entitled to recover past medical bill damages for his treatment at Ethos because he has satisfied his burden of establishing that the treatment received there was reasonably or necessarily obtained based on the accident. *See id*.; *Albertson's*, 475 So. 2d at 988; *E. W. Karate*, 638 So. 2d at 605. According to the

Ethos bill, Mr. Eason's insurance paid $529.83 on the bill, and the facility adjusted and reduced the bill by $428.57. (Dkt 99-22 at 23, 25.) Therefore, Mr. Eason is entitled to recover $26,822.20 ($27,780.60 minus $529.83 in insurance payments and $428.57 in facility adjustments) in past medical bill damages for his treatment at Ethos.

Defendant also asks the court not to award Mr. Eason damages for his Brevard Injury Treatment Solutions bill ($13,200, (Dkt. 99-22 at 38–45)) and his Brevard Accident & Work Injury Centers bill ($1,905, (*id.* at 2–3)) because Mr. Eason did not testify about the reasonableness and necessity of this treatment. (Dkt. 112 at 21.) Defendant's argument is not well taken because Mr. Eason persuasively testified about the reasonableness and necessity of the treatment he received at both facilities. *See* Trial Tr. Vol. 1, 140:20–22, 146:19–147:5, 158:18–159:4. Mr. Eason is entitled to recover past medical bill damages for his treatment at Brevard Injury Treatment Solutions and Brevard Accident & Work Injury Centers because he has satisfied his burden of establishing that the treatment received at these facilities was reasonably or necessarily obtained based on the accident. *See Dungan*, 632 So. 2d at 163; *Albertson's*, 475 So. 2d at 988; *E. W. Karate*, 638 So. 2d at 605. According to the Brevard Injury Treatment Solutions bill, Mr. Eason's health insurance paid $2,303 on the bill, and the facility adjusted and reduced the bill by $336.20. (Dkt. 99-22 at 45.) Therefore, Mr. Eason is entitled to recover $12,465.80 ($1,905 plus $13,200 minus $2,303 in insurance payments and $336.20 in facility adjustments) for his treatment at Brevard Accident & Work Injury Centers and Brevard Injury Treatment Solutions.

Mr. Eason persuasively testified that the treatment he received from SurgCenter

- 69 -

of Palm Beach Gardens and Dr. Reiter was reasonably or necessarily obtained based on the accident. *See* Trial Tr. Vol. 1, 142:3–6, 154:12–20, 164:1–11; *Albertson's*, 475 So. 2d at 988; *E. W. Karate*, 638 So. 2d at 605. Defendant maintains that the court should reduce the recoverable amount of Mr. Eason's bills for his shoulder surgery from SurgCenter of Palm Beach Gardens ($89,397, (Dkt. 99-22 at 20)) and Dr. Reiter ($26,386.20, (*id.* at 12–14)) because the charges are unreasonable in light of what Medicare would have paid for the same services and what Dr. Postma testified he would have charged. (Dkt. 112 at 22.) Trial Tr. Vol. 3, 626:1–627:22. Although Dr. Reiter's bill is a reasonable amount and should not be reduced, part of the SurgCenter of Palm Beach Gardens bill is unreasonable.

On August 16, 2024, the court took judicial notice of the Centers for Medicare and Medicaid Services (CMS) websites. (Dkt. 72; Dkt. 84 at 1.) *See Patagonia, Inc. v. Worn Out, LLC*, No. 22-cv-23858-BLOOM/Otazo-Reyes, 2023 U.S. Dist. LEXIS 75491, at *16 (S.D. Fla. May 1, 2023) ("Courts generally take judicial notice of the contents of government publications and website materials because they are not subject to reasonable dispute, and the contents can be readily determined from sources whose accuracy cannot reasonably be questioned."). The court also takes judicial notice of the Medicare website. *See id.* "The Medicare program was enacted as Title XVIII of the Social Security Act." *Bushnell v. Humana Ins. Co.*, No. 24-CV-14237-CANNON/MAYNARD, 2024 U.S. Dist. LEXIS 230890, at *1 (S.D. Fla. Dec. 20, 2024); *see* 42 U.S.C. §§ 1395–1395*lll*. As a Southern District of Florida court has explained,

> [b]y enacting the Medicare program, Congress established
> a federally subsidized health insurance system administered
> by the Secretary of the Department of Health and Human
> Services ("DHHS").  Under the Medicare system, enrollees
> may elect to enroll in Medicare Parts A and B.
> Alternatively, Medicare enrollees may elect to enroll in a
> Medicare Part C plan, which is intended to provide an
> alternative to the traditional fee-for-service model.
> Medicare Part C is known as "Medicare Advantage," and
> the insurers that administer it are known as "Medicare
> Advantage organizations."  Each Medicare Advantage
> organization must enter into a contract with the Centers of
> Medicare & Medicaid Services ("CMS"), a division of
> DHHS.

*Bushnell*, 2024 U.S. Dist. LEXIS 230890, at *1–2.  Mr. Eason has Medicare Part C, or

a Medicare Advantage Plan (MAP) administered by a private insurance company

Health First.[9]  (Trial Tr. Vol. 1, 188:22–189:4).[10]  Health First entered a contract with

CMS.[11]  Health First as a MAP "must follow rules set by Medicare."[12]

According to CMS's database, SurgCenter of Palm Beach Gardens is an

ambulatory surgical center that accepts Medicare.[13]  CMS uses Current Procedural

---

[9] According to Medicare, "Medicare Advantage is a Medicare-approved plan from a private company that offers an alternative to [o]riginal Medicare for . . . health and drug coverage.  These 'bundled' plans include Part A, Part B, and usually Part D."  *See Understanding Medicare Advantage Plans* at 2, Medicare.gov, an official United States government website, https://www.medicare.gov/publications/12026-understanding-medicare-advantage-plans.pdf (last visited Mar. 14, 2025).

[10] "Q. [A]t the time [of the accident] did you have Medicare? A. Yes. Q. At the time [of the accident] did you also have health insurance? A. I had Health First health insurance."

[11] *See M[edicare] A[dvantage] Plan Directory* at row 385, CMS.gov, an official United States government website, https://www.cms.gov/data-research/statistics-trends-and-reports/medicare-advantagepart-d-contract-and-enrollment-data/ma-plan-directory (last visited Mar. 14, 2025).

[12] *See Understanding Medicare Advantage Plans* at 5, Medicare.gov, an official United States government website, https://www.medicare.gov/publications/12026-understanding-medicare-advantage-plans.pdf (last visited Mar. 14, 2025).

[13] Surgcenter of Palm Beach Gardens, CMS.gov, an official United States government website, https://data.cms.gov/tools/medicare-physician-other-practitioner-look-up-tool/provider/1770929044?size=10&offset=0&npi=1770929044 (last visited Mar. 14, 2025).

Terminology (CPT) codes to identify all the items and services included within certain designated health services categories or that may qualify for certain exceptions. SurgCenter of Palm Beach Gardens charged Mr. Eason the following amounts identified by the CPT codes on his bill: (1) $24,374 for arthroscopic rotator cuff repair (identified by CPT code 29827), (2) $11,750 for arthroscopic extensive debridement (identified by CPT code 29822), (3) $20,891 for arthroscopic subacromial decompression (identified by CPT code 29825), and (4) $20,891 for lysis of adhesion (identified by CPT code 29826).  (Dkt. 99-19 at 29; Dkt. 99-22 at 20.)

The CMS database page for SurgCenter of Palm Beach Gardens states that Medicare pays the facility an average of $2,243 for CPT code 29827.[14]  The average Medicare payment amount for the other procedures is not listed on this page.[15] According to Medicare's outpatient procedure lookup tool, the national average Medicare payment to ambulatory surgical centers for two of Mr. Eason's procedures are $1,647 for CPT code 29822[16] and  $1,682 for CPT code 29825.[17]

Based on this information, Defendant has persuaded the court that SurgCenter of Palm Beach Gardens's charges for these procedures are unreasonable.  *Columbia Hosp.*, 33 So. 3d at 150.  Dr. Postma persuasively testified that Medicare would pay $3,000 to $5,000 for the surgery.  Trial Tr. Vol. 3, 626:17–23.  Therefore, the court

---

[14] *Id.*
[15] *Id.*
[16] *Procedure price lookup*, Medicare.gov, an official United States government website, https://www.medicare.gov/procedure-price-lookup/cost/29822 (last visited Mar. 14, 2025).
[17] *Procedure price lookup*, Medicare.gov, an official United States government website, https://www.medicare.gov/procedure-price-lookup/cost/29825 (last visited Mar. 14, 2025).

concludes that $2,243, or the highest amount Medicare would have paid based on the identified CPT codes, is a reasonable amount to charge for CPT code 29826.  As such, the court finds that Mr. Eason is entitled to recover $7,815 ($2,243 plus $2,243 plus $1,647 plus $1,682) in past medical bill damages for his treatment at SurgCenter of Palm Beach Gardens.

Defendant maintains that Dr. Reiter's $26,386.20 surgery bill, (*see* Dkt. 99-22 at 12–14), is an unreasonable amount for twelve appointments and the surgery performed on Mr. Eason.  (Dkt. 112 at 21–22.)  In Defendant's view, the bill should be reduced to the rate that Medicare would pay for the surgery and appointments.  (*Id*. at 22.) However, Dr. Reiter persuasively testified that unlike SurgCenter of Palm Beach Gardens, he did not accept Medicare at the office where he treated Mr. Eason.  (Trial Tr. Vol. 2, 314:11–12, 317:22.)  The court thus rejects Defendant's argument and deems Dr. Reiter's bill a reasonable amount.  Mr. Eason is entitled to recover $26,386.20 in past medical bill damages for his treatment by Dr. Reiter.

Accordingly, Mr. Eason is entitled to damages for past medical bills in the amount of $106,634.17, equating to $33,084.97 in undisputed medical bills plus $26,882.20 as to Ethos plus $12,465.80 as to Brevard Accident and Injury Treatment Solutions plus $7,815 as to SurgCenter plus $26,386.20 as to Dr. Reiter.

### ii.    Future Medical Costs[18]

It is a plaintiff's burden to establish that future medical expenses will more probably than not be incurred. *Kloster Cruise Ltd. v. Grubbs*, 762 So. 2d 552, 556 (Fla. Dist. Ct. App. 2000). "That burden may only be met with competent substantial evidence." *Id.* There must be "evidence in the record from which the [factfinder] could, with reasonable certainty, determine the amount of medical expense [plaintiff] would be likely to incur in the future." *DeAlmeida v. Graham*, 524 So. 2d 666, 668 (Fla. Dist. Ct. App. 1987). A mere possibility that certain treatments might be obtained in the future cannot form the basis of an award of future medical expenses. *Truelove v. Blount*, 954 So. 2d 1284, 1288 (Fla. Dist. Ct. App. 2007); *Nevarez v. Friskney*, 817 So. 2d 856, 858 (Fla. Dist. Ct. App. 2002) (holding that the evidence did not support an award for future medical expenses because even though the plaintiff presented expert testimony regarding possible need for future surgery, she presented no evidence regarding the cost of any future surgery and further testified that she would not have the surgery).

The court concludes that Mr. Eason has failed to establish by a preponderance of the evidence that he is entitled to damages for future medical costs. *See* Fla. Standard Jury Instruction (Civil) 501.2b (allowing damages for medical expenses "to

---

[18] Defendant retained an expert certified public accountant and financial planner, Mr. Bishop, to rebut Dr. Lichtblau's future care findings. Trial Tr. Vol. 5, 900–928. During the trial, the court sustained an objection to Mr. Bishop's most recent opinion regarding future care because it was not included in his report. *Id.* at 917:14–918:6. Mr. Bishop testified that since he is not a medical doctor, he can only give his opinions on future medical care within a reasonable degree of economic and financial certainty, not medical certainty. *Id.* at 921:1–10. Therefore, the court does not consider Mr. Bishop's testimony to be persuasive.

be so obtained in the future").  In support of his request for future medical expenses, Mr. Eason relied at trial on the testimony of Drs. Lichtblau and Raffa.  (Dkt. 111 at 18–21.)  Dr. Lichtblau testified that after he spoke to Mr. Eason's treating physicians, he formulated a future care plan based on Mr. Eason's current condition.  Trial Tr. Vol. 2, 442:1–16, 447:2–25.  However, Plaintiffs did not offer the care plan into evidence.  Instead, during his testimony, Dr. Lichtblau unpersuasively described a few of the items recommended in the care plan.  *Id.* at 442:1–463:9.  Therefore, the court does not find Dr. Lichtblau's testimony regarding future care persuasive.  Relatedly, Dr. Raffa was retained in this case to "undertake a present value analysis of the future cost of care as outlined or identified by" Dr. Lichtblau.  Trial Tr. Vol. 3, 499:2–5.  As such, the court finds Dr. Raffa's testimony regarding future care unpersuasive for the same reasons it finds Dr. Lichtblau's testimony unpersuasive.

At the time of trial, Mr. Eason had not had the acromioclavicular or reverse shoulder replacement surgeries recommended by Dr. Reiter.  Trial Tr. Vol. 1, 197:21–25; Trial Tr. Vol. 2, 312:3–13.  On April 5, 2023, Mr. Eason told the nurse who was treating him at OSI Health that he was hesitant to get further surgeries "due to his age and healing time" and the risks associated with surgical interventions.  (Dkt. 99-14 at 31.)  Accordingly, the weight of the evidence does not support Mr. Eason's entitlement to future medical costs in relation to the accident.  *See Truelove*, 954 So. 2d at 1288.

### iii.   Noneconomic Damages

Having concluded that Mr. Eason suffered permanent injuries to his left shoulder due to the January 19, 2021 accident, the court finds that he is entitled to

damages for pain, suffering, mental anguish, inconvenience, and loss of capacity to enjoy life.  Fla. Stat. § 627.737(2); *Wald*, 64 So. 3d at 1206.  With respect to these noneconomic damages, both in the past and in the future, "[t]here is no exact standard" of measurement, but the "amount should be fair and just in light of the evidence."  Fla. Standard Jury Instruction (Civil) 501.2.

Upon consideration of the evidence presented at trial, the court deems it fair and just to award Plaintiff $200,000 in past noneconomic damages for his pain, suffering, mental anguish, inconvenience, and loss of capacity for the enjoyment of life resulting from his collision with the mail truck.  In making this determination, the court credits Mr. Eason's testimony regarding the pain he suffered because of the accident and notes that the record supports that Mr. Eason's life and marriage have been affected due to the injuries he sustained from the accident.

The court also considers it fair and just to award Plaintiff $100,000 in future noneconomic damages for his future pain, suffering, mental anguish, inconvenience, and loss of capacity for the enjoyment of life caused by the accident.  Dr. Lichtblau persuasively testified that according to the United States Vital Statistics, Mr. Eason's projected life expectancy based on his age at trial was 10.6 years.  Trial Tr. Vol. 2, 446:22–447:1.  Mr. Eason was 73 years old at the time of the accident.  *Id.* at 433:13–22.  The court finds this award fair and just in light of Mr. Eason's above-average health and vigor despite his age at the time of the accident, as well as credible testimony that he continues to be affected by his permanent shoulder injuries, counterbalanced against the preexisting wear and tear on his body due to his age and decades as a

cyclist. *See, e.g.*, *Triolo v. United States*, No. 3:18-cv-919-MMH-JBT, 2022 U.S. Dist.
LEXIS 51220, at *52–53 (M.D. Fla. Mar. 22, 2022) (deeming a combined award of
$145,000 in past and future noneconomic damages appropriate where "overall [the
plaintiff's] pain [wa]s less severe than described"); *Torres-Torres v. KW Int'l, Inc.*, No.
5:18-cv-164-OC-30PRL, 2020 WL 1820754 (M.D. Fla. Feb. 20, 2020) (a jury verdict
in an automobile negligence action awarding $114,500 in past noneconomic damages
and no future noneconomic damages for a permanent injury caused by the accident);
*McIntyre v. United States*, No. 5:14-cv-164-OC-10PRL, 2016 U.S. Dist. LEXIS 121341,
at *16 (M.D. Fla. Sept. 8, 2016) (awarding $150,000 in total past and future pain and
suffering resulting from permanent injuries caused by a vehicle accident).

### E. Comparative Negligence

Defendant raises comparative negligence as an affirmative defense, asserting
that Mr. Eason was forty-nine percent at fault for the January 19, 2021 accident. (Dkt.
112 at 8–10.) *See* Fla. Stat. § 768.81(3); *Williams*, 974 So. 2d at 1061 n.10; *Bongiorno*,
159 So. 3d at 1029. To prove that Mr. Eason was comparatively negligent, Defendant
relied at trial on the testimony of Dr. Kadiyala. (*See* Dkt. 112 at 10.) Dr. Kadiyala is
an engineer, Trial Tr. Vol. 4, 649:8–9, who opined that Mr. Eason had nearly five
seconds to avoid hitting the USPS truck, *id.* at 696:1–4. Because Mr. Eason was
bicycling about as fast as a slow-moving car, the court is not persuaded that he could
have avoided the accident in such a short amount of time. Therefore, the court ascribes
none of the fault for the accident to Mr. Eason. Defendant has failed to meet its burden
by a preponderance of the evidence that Mr. Eason was comparatively negligent in the

accident.  *See Bongiorno*, 159 So. 3d at 1030 ("[The defendant] failed to sustain its

burden[,] . . . and[] therefore, the trial court erred in finding [the plaintiff]

comparatively negligent for her injuries.").

### F. Mrs. Radaszewski's Loss of Consortium

As to Mrs. Radaszewski's loss of consortium claim, the court notes that when

the factfinder "finds that one spouse has sustained injuries as a result of the negligence

of a third party, an award of damages to the other spouse for loss of consortium is not

automatic." *Peterson v. Sun State Int'l Trucks, LLC*, 56 So. 3d 840, 842 (Fla. Dist. Ct.

App. 2011).  To succeed on the loss of consortium claim, "the claiming spouse must

present competent testimony concerning the impact that the incident has had on the

marital relationship." *Id.*

Having concluded that Defendant's negligence caused Mr. Eason to suffer

injuries, the court finds that this negligence also caused Mrs. Radaszewski to lose

consortium with Mr. Eason.  *See id.*; *Gates*, 247 So. 2d at 43–45.  Mrs. Radaszewski

persuasively testified that the accident caused stress in her marriage by preventing Mr.

Eason from assisting with household chores until he had his shoulder surgery.  (Dkt.

102 at 139, 153.)  Mrs. Radaszewski further testified that she and Mr. Eason could not

do some of the activities that they used to enjoy, such as kayaking.  (*Id.* at 142–43.)

Although Mrs. Radaszewski testified that Mr. Eason experienced some bouts of

forgetfulness concerning everyday topics such as the right paint color and an item from

the store, the court considers his age before and after the accident in formulating an

award for her loss of consortium and has already explained why the evidence does not

support that Mr. Eason more likely than not suffered a brain injury from the accident. The court also considers that Mrs. Radaszewski and Mr. Eason have been able to do some of the activities they enjoyed before the accident and to embark on domestic and foreign travels after the accident despite Mr. Eason's injuries.

Therefore, upon consideration of the evidence presented at trial, the court deems it fair and just to award Mrs. Radaszewski $5,000 for her loss of consortium with Mr. Eason, equating to $3,000 for her past damages and $2,000 for her future damages. *See Floyd v. Rhoads*, 15 FJVR 3-26, 2015 WL 1192180 (Fla. Cir. Ct. Jan. 15, 2015) (awarding a wife $2,500 for past loss of consortium and $1,000 for future loss of consortium when the defendant's negligence in operating a vehicle caused the wife's husband to suffer permanent injuries).

## CONCLUSION

Based on the above findings of fact and conclusions of law:

1. The Clerk is **DIRECTED** to enter judgment in favor of Plaintiffs in the amount of $411,634.17, including $106,634.17 in past medical bills, $200,000 in past noneconomic damages, and $100,000 in future noneconomic damages for Mr. Eason's negligence claim and $5,000 for Mrs. Radaszewski's loss of consortium claim.

2.  The Clerk is **FURTHER DIRECTED** to terminate all pending

motions and deadlines and to close this case.

**ORDERED** in Orlando, Florida, on March 24, 2025.


_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE


Copies furnished to:

Counsel of Record